GODSHALL *against* MARIAM.

The regulation of a lot by regulators under the act of 9th March 1771, from which no appeal is entered to the next Common Pleas, is conclusive as to the foundations and party walls of buildings erected conformably thereto; but not so as to the lines of the lot upon which there are no buildings.

THIS was an action of trespass to recover damages from the defendant for breaking and entering the plaintiff's close, and removing five pannels of fence. The defendant pleaded not guilty, and *liberum tenementum.* Upon the trial before the Chief Justice at *Nisi Prius* in *June* 1806, the plaintiff proved a regular title to a lot of twenty feet in breadth by one hundred and ten feet in depth, on Third street in the *Northern Liberties,* which lot was stated in a deed bearing date the 15th *November* 1794, from Dr. *John Redman* to the person under whom the plaintiff claimed, to be " bounded *northward* " *by a thirty five feet corner lot,* granted or intended to be " granted by the said *John Redman* to *Adam Logan.*" He also shewed that his lot was duly regulated on the 25th *July* 1798, by the proper officers under the act of 9th *March* 1771, by marking the lines in front and in rear, and putting stakes at all the corners; that the owner of the Northern lot had knowledge of the regulation; that there had been no appeal from any order

*Bynkershoek,* we are told, would not venture to define a domicil. *Vattel* says, it is a fixed residence, with an intention of always staying there. It may be defined, in our opinion, to be *a residence at a particular place accompanied with positive or presumptive proof of continuing it an unlimited time;* and is the conclusion of law on an extended view of facts and circumstances. The determination in the case of Major *Bruce* in the House of Lords does not militate with any part of this definition. *Bruce* left *Scotland* when very young, and became completely domiciled in the *East Indies,* in word and in deed, by a residence of sixteen or seventeen years. Towards the close of his life, and after making a fortune, he expressed a resolution of spending the remainder of his days in his native country, and accordingly took measures to send his property before him, when he suddenly died. It was held that he was clearly domiciled in the *East Indies* in the first instance, and that the intention to change could have no effect. Though declarations are good evidence that a person has changed his domicil, no fixed views of that sort can be supposed equivalent to the actual abandonment of one domicil, and the acquisition of another.

The domicil of origin arises from birth and connexions. *A minor during pupillage cannot acquire a domicil of his own. His domicil therefore follows that of his father, and remains until he acquires another, which he cannot do until he becomes a person sui juris.*

With respect to the facts in the case before us, *Thomas Guier* left *Connecticut* in the year 1795, under age, in company with his father *Stephen,* who, quitting his native country, migrated to *Delaware,* and became a resident of that state by acts of the most unequivocal nature. There cannot be the least

of the regulators; that the plaintiff had built a brick house conformably with the regulation, twenty feet in front and about twenty five feet deep, and that he erected the fence in a line with the side of his house. The trespass complained of, was the defendant's taking up this fence and setting it down in the plaintiff's lot, about two feet six inches within the line of regulation.

1808.

GODSHALL
v.
MARIAM.

The defendant shewed title to the before mentioned corner lot of thirty five feet, under a deed from *Redman* to *Logan* of 15th *November* 1794, in which it was said to be bounded " north-" ward by *Coates's* street." He then gave in evidence a regulation of the cross streets in the *Northern Liberties*, commenced before the regulation of the plaintiff's lot, but not published and confirmed until the 5th *August* 1799. This regulation had no connexion with the regulation of lots, but was a distinct thing, authorized by an act of 17th *April* 1795; and the sur-

doubt that the father became domiciled there. His son *Gideon* was the harbinger of the family, and was actually a resident in *Delaware* in the year 1792, when he was a married man, a housekeeper, and the commander of a vessel. Induced probably by the establishment of his son in that part of the world, the old man followed his fortunes, and settling under his immediate auspices, became a farmer; a mode of life in itself more indicative than any other of views of permanent residence. The father being thus domiciled in *Delaware*, his minor son *Thomas* was domiciled there also, who while under age never acquired or could acquire a domicil *sui juris*. If it were a point of doubtful decision whether *Thomas* was ever domiciled by any action of his own, *Delaware* would of course be his *domicilium originis*, and the country whose law would regulate the succession to his personal estate.

But we do not rest his domicil in *Delaware* on this ground: he acquired one of his own. From the time old *Guier* and family, with his son *Thomas*, arrived in *Delaware*, they seem to have been connected with *Gideon Guier*, and to have been both in some degree dependent upon him. He settled his father on a plantation, and *Thomas* became his apprentice in the seafaring business. Having served out his time, he received wages from his brother. About the year 1797 *Thomas* was shipwrecked, and returning by the way of *New York*, he proceeded not to *Connecticut* but to *Wilmington*. He studied navigation after he was of age in the borough of *Wilmington*. His diligence and good conduct recommended him to notice. In a year or two he became a mate, then a captain and part owner of a vessel, in which character he sailed in 1801, when he was murdered by the blacks in the island of *St. Domingo*. During this whole period we hear nothing from him of the *animus revertendi*. So far from it, that after paying a visit to his friends in *Connecticut* in 1800 or 1801, he hastened back to *Wilmington* as the place of his employment, and the residence of his friends. Not a single witness of the great number who have been examined in *Connecticut* and *Delaware*, ever heard a word escape his lips of his intention to return; or that *Wilmington* was only the place of his temporary residence. *Thomas Guier* entered the world as an

veyors who performed the duty, put the line of *Coates's* street in this place about two feet six inches southward of the accustomed line. In consequence of this the defendant could not have his complement of ground without interfering with the regulation of the plaintiff's lot; and he therefore moved the fence. There was also some evidence that the regulators themselves had since questioned their own regulation of *Godshall's* lot, as being founded on a mistake of the street line; and that there was *more* ground to the southward of the plaintiff, than was necessary to satisfy all claims.

Upon these facts it was argued for the plaintiff, that the walls of his house, and the *lines of his lot*, were conclusively fixed by the regulation, and that the survey of *Coates's* street not being

adventurer, and in a few years acquired a good deal of property. It is therefore reasonable to believe he felt the full force of this irresistible cement to locality and situation. This consideration founded on *interest*, furnishes the strongest proof that he had fixed on *Wilmington* as the place of his domicil. A remark of the unerring observer of human nature, that " where the treasure " is the heart will be also," may be here applied with strict propriety.

Several witnesses say they believe he had fixed his residence at *Wilmington;* others say they believe he had not fixed it there. This appears to be mere opinion. Not a word from *Guier* himself has been given in evidence; but his *silence* on the subject is an argument to shew his views were permanently fixed *on that country,* in which his affairs wore the most promising aspect. When he proposed to settle his affairs, he does not think of *Connecticut,* but of sending to Judge *Booth* at *New-Castle,* to draw his will in favour of that part of his family who were resident there.

It is I think extremely doubtful whether voting and paying taxes are in any case necessary to constitute a domicil, which being a question of general law, cannot depend on the municipal regulations of any state or nation. Voting is confined to a few countries, and taxes may not always be demanded. *Guier* was a seafaring man; and one of the witnesses says that between the 14th *January* 1800 and the 15th *October* 1801, he sailed six or seven times. Is it any wonder a single man thus engaged in trade should escape taxation? It frequently happens that young men who never go abroad, are not discovered to be objects of taxation till they have reached the age of five or six and twenty. If *Guier* escaped taxation through the neglect of the officers of government, it is impossible to conceive how their neglect can have any effect on the question of domicil. The almost constant absence of a sailor from home, actually effaces from his mind voting at elections; yet it appears *Guier* was present at *one* election and offered his ticket, which, though not received, is a striking fact to shew he considered himself in the light of a citizen. The ticket not being received does not alter the nature of the transaction on the part of *Guier;* the evidence resulting from it, of intention to settle and reside, is the same as if it had been actually received.

completed until after the regulation, could make no impression 1808.
on the cause: but that at all events, that survey did not, and GODSHALL
was not intended to, ascertain where the true line of *Coates's* v.
street was, but to fix a line for its future course. That there- MARIAM.
fore, for any thing that appeared, the regulation was right. For
the defendant it was said, that the regulation, so far as it re-
spected the unbuilt part of the lot, was not conclusive, and that
as the plaintiff's lot was bounded by a thirty five feet *corner*
lot, the whole question was, where the corner of *Coates's* street
was, which the survey conclusively shewed. The Chief Justice
charged the jury that there could be no doubt that the walls of
the plaintiff's house were fixed irrevocably in 1798, by a regu-
lation from which there was no appeal, but he would reserve
the question *whether the lines of the lot were also fixed.* That
the jury might then consider them as not fixed; and if so, he
thought the survey was strong evidence to shew where the line

As to his sailing *one* voyage from *Philadelphia*, at which time it is proba-
ble he obtained a certificate of his being a native of *Connecticut* and a citizen
of the *United States*, they appear to be accidental circumstances, such as may
be looked for in the life of a sailor, and no wise incompatible with his resi-
dence in another place.

Employments of the most opposite character and description may have
the same effect to produce a domicil. A man may be alike domiciled, whe-
ther he supports himself by ploughing the fields of his farm, or the waters of
the ocean. It is not exclusively by any particular act that a domicil, gene-
rally speaking, is acquired; but by a *train of conduct* manifesting that the
country in which he died was the place of his choice, and to all appearance,
of his intended residence. The sailor who spends whole years in combating
the winds and waves, and the contented husbandman whose devious steps
seldom pass the limits of his farm, may in their different walks of life, exhi-
bit equal evidence of being domiciled in a country. Every circumstance in the
conduct of old *Guier* and his son *Thomas*, taking into view the unsettled
mode of life of the latter, affords the fullest proof that they were both domi-
ciled in *Delaware.* If the proof be stronger in either case, it is in the case
of *Thomas*, who, though employed in traversing the globe from clime
to clime, constantly returned to *Wilmington*, the source and centre of his
business, the seat and abode of his friends and connexions. His " heart
" untravelled" appears to have been immoveably fixed on the spot, to
which he was attached by the powerful tie of interest, and the strongest obli-
gations of social duty; and never for a moment to have pointed a wish
to any other country.

We are of opinion *Thomas Guier* was domiciled in the state of *De-
laware*, during pupillage; and that he was also domiciled there after he
became *sui juris;* and do decree that his personal property *be distributed
according to the laws of* THE STATE OF DELAWARE.

1808.

GODSHALL

v.

MARIAM.

of *Coates's* street was, and where the defendant's lot began. The jury however found a verdict for the plaintiff.

A motion for a new trial was made by the defendant's counsel, because the verdict was against law and evidence; and this motion and the point reserved were now argued by *Binney* for the plaintiff, and by *Milnor* and *Hopkinson* for the defendants; but the argument was almost entirely confined to the conclusive nature of the regulation.

TILGHMAN C. J. delivered the opinion of the court.

The only question now to be decided by the court is, whether the regulation of the lines of a lot in the *Northern Liberties* of the city of *Philadelphia*, made by virtue of the act entitled " An act for appointing regulators in the southern parts of the " *Northern Liberties* of the city of *Philadelphia*, and for other " purposes therein mentioned," (a) is conclusive on the parties, not only as to that part of the lot on which buildings are erected, but throughout the whole extent of it.

The act, after reciting in the preamble, that great inconvenience had ensued for want of surveyors or regulators to lay out the proper gutters, channels, and conduits for carrying off the waters, " and *to set out the lots* and to *regulate the walls* " to be built between party and party," goes on to enact, " that " the regulators shall upon application made to them have full " power and authority to regulate and lay out the proper gut- " ters, channels and conduits for the carrying off the waters " within the limits of the said described piece of land, and to " enter upon the lands of any person or persons *in order to set* " *out the foundations*, and *to regulate the walls* to be built " between party and party as to the breadth and thickness " thereof, which foundations shall be equally laid on the lands " of the persons between whom such party wall is to be made." &c. &c.

The third section inflicts a penalty on persons who shall begin to lay the foundation " *of any party wall*, or *any wall* " *fronting on any of the streets*," before the same is viewed and directed by the regulators.

The fourth section gives an appeal to the justices of the *next* county Court of Common Pleas, in case either party, between whom *such foundation or party wall is to be made*, shall con-

(a) *9th March* 1771, 1 *St. Laws.* 549.

ceive himself aggrieved by any order or direction of the regulators; and the justices are forthwith to summon a jury and proceed to determine the matter in dispute, according to the course of the common law. The fifth section ascertains the fee to be paid to the regulators for their trouble, " *in setting out and regulating the lines of each lot.*"

1808.

GODSHALL
*v.*
MARIAM.

These are the only parts of the law material in the present question. It appears then that although the preamble speaks of *setting out the lots,* yet the enacting part of the law gives no power to the regulators to enter on any man's land for any other purpose than that of regulating the *foundations* and *party walls* of buildings; consequently they have no power to enter at all for the bare purpose of ascertaining the lines of a lot, nor is there any appeal given but in case of a *building.* There is great reason why the decision of the regulators, unappealed from, should be conclusive as to the building; because if it were not, the walls which were built under the authority of officers, whom the party was obliged to employ, might be afterwards pulled down. This would be a grievance too ruinous to be submitted to, and cannot be intended to be the meaning of the law. Indeed considerable inconvenience may result from questioning the boundaries in any part of the lot, after a house has been built. And if it was in the power of the court to make or alter the law, they would prevent that inconvenience by directing that the lines fixed by the regulators should be conclusive. But in a case where valuable property is to be affected, they are not authorized to draw inferences from slight expressions, not warranted by the principal parts of the law. No express power is given to fix the lines of the lot, when there is no party wall. But it is objected that a fee is given " *for setting out and regulating the lines of each lot.*" The answer is, that this cannot *enlarge* the power given before, but must be construed by *reference* to that power; that is to say, the fee is given for *setting out* and *regulating the lines,* so far as is necessary for the purpose of regulating the *front* and *party* walls; and it is evident that part or the whole of *two lines* at least, must be *set out* and *regulated* in order to do this. This construction renders the whole law consistent, without doing violence to any part of it. I am therefore of opinion that the parties are not concluded by the regulation made in that part of the lot, which lies back of the house. There must of course be a new trial, because the

1808.     court suppose that the jury found their verdict under an opinion

GODSHALL   that the act of the regulators was *conclusive*. The weight of

*v.*       the evidence was against the regulation. On the second trial,

MARIAM.    the parties knowing precisely on what point the cause will turn,
           will come better prepared to contest the real merits, that is, the
           true location of *Coates's* street; for that will be the only matter
           in dispute.

                                         New Trial granted.