Me. Justice Westcott
delivered the opinion of the/ court.
In this case we consider first the motion for a new trial.
One of the grounds for the motion for a new trial was 'that the verdict was contrary to law and the instructions of the court.
To this question we address ourselves. Leonard G. Dennis is here indicted for falsely, corruptly, knowingly and maliciously swearing that he had resided and had his habitation, domicil, home and place of permanent abode in : Florida for one year, and in the county of Alachua for six ‘months, next preceding the 19th day of October, A. D. 1878.
The defendant having plead not guilty to this indictment, ■it devolved upon the State to prove the alleged falsity of the oath of the defendant. In other words, to prove that he, Dennis, had not so resided, so had his habitation, &c., as sworn. We have examined and analyzed the evidence carefully. Stating it chronologically, it is substantially as follows:
Leonard G. Dennis came from Beverly, Massacliuselts, to Alachua county, Florida, in the year 1866. After acquiring political rights in that county, he exercised the right of suffrage up to the year 1876. He was elected to the State Legisalture as a member of the Assembly for that year. He purchased a house and lot in Gainesville, the county site of Alachua county, and that his family resided in Alachua county during this time is not questioned. It was his habit to be absent from home a large part of his time, one witness says about half of the time. It was his habit to send his family North during the summer. In the summer of 1876 his family went North and had not returned up the time of the trial of this cause. Where they went, or where they are, or for what purpose they left, is not disclosed, except so far as appears from the testimony1 of Barnes. He says he does not know where his (Dennis1) family has been, but thinks they are visiting Dennis1 father, at Beverly, Massachusetts.
In March, 1877, Dennis left Gainesville. He went to Washington City for Federal position; he obtained a position in the Treasury Department; between March,' 1877, • and March, 1878, he was employed in this office at Washington. The Stated witness who testifies to these fa'cta says that he met Dennis in Boston in the summer of 1877, and that he saw him also on a visit to Beverly, Massachusetts.
In the spring of 1877 he sold‘his house in Gainesville, retaining his furniture, which he placed in the care of a friend in Gainesville, with instructions to sell some of it and fix up a room for him with the remainder. To this friend^ house his books, papers and library were carried, and there they remained. He occupied a room on this house upon his return to Gainesville. His house was for sale for a year or .two before he sold it, because, as stated by the witness, it was too small for him. In 1877, three boxes marked “Mrs. Dennis, Beverly, Massachusetts,11 and weighing 428 pounds, -were shipped from Gainesville by John W. Raymond. The house was sold to Sanchez, who took possession in May, 1877. The sale was negotiated by telegraph, Dennis being at the time in Washington City. Sanchez had a deed for the house written, describing Dennis as of Beverly, Massachusetts. He sent it to Washington to Dennis. Dennis sent it back declining to execute it because it described him as of Beverly, Massachusetts, instead of Alachua county, Florida. He (D.) sent back another deed describing himself as of Alachua county, Florida. Dennis i;ook a mortgage on the house. In 1877 there was assessed against him a poll-tax, a tax on a lot in Gaines-ville, and a tax on a small amount of personal property. *106 The land "was sold for taxes. In this year he sold two horses in Gainesville. He was in Gainesville in the spring and fall of 1878, in March, 1878, and in November, 1878. •He remained in Gainesville for a' month or six weeks in . the spring of 1878. Barnes, the State’s witness, who seems to be. most reliably posted as to Dennis’ affairs, testifies that Dennis would have returned earlier than the spring of 1878, but he (the witness) adviséd him not to come; that, he remained awhile in Gainesville in the spring of 1878, and then went to Washington and ctpne back again and remained about three weeks; that he then stated he had resigned his position in Washington. He- next saw him in the fall of 1878.
Another witness for the State (Sanchez) says he was in Gainesville when the Congressional Investigating Committee was there, (no date stated,) and again in the spring of 1878. He was here last during Pall Term of ,1878, and during Spring Term. He stayed here two or three months.
It appears that there were indictments against Dennis pending in the Circuit Court of Alachua county. One of the witnesses testified that he still’ owns forty or eighty acres of land in Alachua county.
Thus stating the evidence, the next question is, was the verdict of guilty of false swearing contrary to the law of the case and the instructions of.the court, within the meaning of the rule controlling the subject.
The determination of this question involves the definition of the terms “resided,” “habitation^” “domicile,” “home and permanent place of abode,” as used in article 14, sec. 1 of the Constitution. These terms are there used in reference to the qualifications of electors in each county “at all elections under the Constitution,” and aie to be-defined with strict' reference to the connection in which they stand, viz: the political domicile of the party.
Mr. Cooley, in his Constitutional Limitations, says, “the words ‘inhabitant,’ ‘citizen’ aDd ‘resident,’ as employed in different constitutions to define the qualifications of electors, mean substantially the same thing,” and the cases cited to sustain this view contain expressions to that effect. In the State of New York in the case of Rosevelt vs. Kellogg, (20 John., 211,) the Supreme Court of that State remark, when speaking of the words resident and inhabitant, “that they signify the same thing.” In a late case, however, in the same court, Frost vs. Brisbin, (19 Wend., 13,) Chief Justice Nelson, speaking ‘for the court, says, “it may, I think, be doubted if this position is entirely accurate, as the latter term implies a more, fixed and permanent abode than the former.” In speaking of the word inhabitant, Lord Eldon, (10 Ves., 339,) says no word “is capable of a larger or more limited interpretation, and the construction is always to be made with'reference to the nature of the subject ”
Tinder the Constitution of Massachusetts, operative in 1813, a party'was given the right to vote if he was an inhabitant of the district. Chiéf Justice Parker, speaking for the court in a case (Patterson vs. Johnson, 10 Mass., 506,) where the question was whether a party was an inhabitant of one town or another in the State, makes a contrast between cases of this character involving political privileges and those arising under the pauper settlement cases in that State. In the case of Lincoln vs. Hapgood, (11 Mass., 352,) 'the same eminent jurist had occasion to determine what constituted an inhabitant. Lincoln had his home and most usual residence at Petersham. It was proved that for several years preceding, and also in the year when his right to vote was questioned, he had been, absent several weeks at work at Belchertown, and in that year his absence had been for ten weeks up to a few days before the elction, going away in February and returning in May. At an election in Belchertown in April of that year he had been recognized as a voter by the selectmen of that town, and had actually voted in the election. As to this, Parker ,C. J. says: “He went to Belchertown for a specified and temporary purpose and had frequently done it before, always considering Petersham as his home and always returning there after a short absence.” It was held that he was an inhabitant of Petersham. The matter of the vote was explained by the fact that it’ was at an election throughout the State, and the opinion of the elector was. that it was only necessary to be entitled to vote at any place in the State to vote at the election.
In the case of Williams vs. Whiting et al., the selectmen of the town of Dedham had rejected the vote of Williams, upon the ground that he had not resided in that town for the space of one year next preceding the 2nd of November, 1812. The facts were that' on the 28th of November, A. D. 1811, he was a householder and had a family at Rox-bury, On that day he came to Dedham for the purpose of performing the duties of Clerk of the Court. His family remained in Roxbury until the 12th November, when he rfemóved his family to Dedham. During that time he-passed his nights at Dedham. He was held to be a resident of Roxbury.
The case of Harvard College vs. Gere, (5 Pick., 374,) involved the question as to the effect of an actual residence in Washington City, engaged in the public duties of a United States Senator. The court held that he was still an inhabitant of the town where he resided when elected. In that case Chief Justice Parker says, “an inhabitant by our constitution and laws is one who, being a citizen, dwells or has his home in some particular town where he has municipal rights and duties and is subject to particular burdens; and this habitancy may exist or continue notwithstanding m actual residence in another town or another county,provided the absence is not so long or of such a nature as to interrupt or destroy the municipal relation previously formed" In this case the alleged change was a change of local domicile or residence in counties in the same State, but the change here, if any, was a change of political domicile from one State to another. The rule is' certainly not less strict in the latter case.
Under the laws of New Jersey in 1840, in order to constitute an elector it was required that a party should have “resided in the county where he claims a vote for at least one year immediately preceding the election ” The Supreme Court of New Jersey in defining the term “resided” in this connection, says, ,(3 Harr., 144,) “the word residence (fixed residence I mean,) is generally used as tantamount to domicile.” Thhs in 1 Binn., 352, it is said that a domicile may be defined to be a residence at a particular place, accompanied with positive or presumptive proof of continuing it an unlimited time. So Kent, in his Commentaries, vol. 1, page 76, in treating of national residence, speaks of it as tantamount to national domicile, and Vattel has defined it the same way. Such domicile once obtained, remains to the possessor. thereof notwithstanding occasional visits to foreign countries and until another domicile is acquired. This principle is applied to pauper cases and to questions of domestic settlement. The settlement or legal residence of a pauper is prima facie at the place of his birth, ■ and this settlement continues until a new one is gained. There can be no suspension of it. I do not mean to say that the elective franchise of the citizen may not be suspended, for, pending the year’s residence, by our statutes the fact is so, but I mean to say that a residence in law once obtained continues without interruption until a new one is gained.” * * * * * “The place where a man is cormorant may perhaps be properly considered as prima facie the place of his legal residence; this presumption, however, may be easily overcome by proof of facts to the contrary. If a person leave *107 his original residence animo non revertendi and edopt another for a space of time, however brief, if it be done animo ma-nendi, his first residence is lost. But if in leaving his original residence he does so animo revertendi, such original residence continues in law notwithstanding the- temporary absence of himself and family. Such is the uniform language of the books, as well as the clear conclusion of common sense.” This court in speaking of an actual residence in Washington by persons holding offices at that point, says: “Many of our Senators and Representatives in Congress habitually close their houses at home and move with their families to Washington during the winter. Some rent rooms, others rent houses, and they remain there sometimes two-thirds of the year without even a visit to their respective homes; and yet has any man ever supposed that in the eye of the law they were not residing in the State of New Jersey all that time.” * * * “There is no distinction made by law in favor of those who are public officers and leave their residence to attend upon public business. It is all left to depend upon the same general principle that a man's legal residence is not changed where he leaves it for temporary purposes and transient objects, meaning to return when these purposes are answered and objects attained”
Applying the rule deducible from these cases to the evidence here, it is clear that the State failed to prove, and that it did not appear from the evidence that the defendant had ever ceased to be an inhabitant or resident of Gaines-ville, or that he had charged his habitation, home and place of abode and domicile from Alachua county, Florida. From the evidence of the State, (the defendant having introduced no testimony,) it is clear that the legal domcicile, habitation, residence and home of the defendant was Alachua county, Florida. A person actually living for the time being in Washington City, as the defendant was here living, his family at the same time being shown to be visiting his father in Massachusetts, is considered as residing and having a habitation and residence for political purposes, in other words, a political domicile, at their home and place from which he is temporarily absent. We have exhausted the material at our command and we cannot find a single case in the United States or elsewhere, where the common law prevails at all, applicable to the question of political domicile, any reasonable construction of which would sustain the conclusion that the legal residence or habitation, when viewed in reference to qualification to exercise the elective franchise, was not in this case Alachua county, Florida.
It is unnecessary here to insert at length the instructions of the court at the trial upon the subject. They are fair, impartial, and, as applicable to the case, correct. The verdict of the jury, therefore, in this case was plainly contrary to law and the instructions of the court, and should have been set aside and a new trial granted. Such would have been the law, even in a civil case. Nash vs. P. and G. R. R. Co., 15 Fla., 797.
We see no necessity for stating more than we have in reference to the motion for a new trial.
Thus disposing of the errors assigned as to the refusal to grant a new trial, we will examine the sufficiency of the indictment, a question which is presented by the motion in arrest of judgment.
This indictment is framed under and with reference to section 1 of sub-division 15 of chapter 1637, Laws of Florida. That section provides: “If any person shall be guilty of wilful and corrupt false swearing or affirming when interrogated as to his qualifications as an elector, or when his testimony may be required in any contested election, or shall wilfully and .corruptly procure another person to swear or affirm falsely as aforesaid, he shall, on conviction, suffer the pains and penalties of perjury.” This is the same as the enactment anterior to the Code. Thomp. Dig., 80.
It is evident from the simple reading of this section that an indictment to be sufficient must allege in due and proper form a “wilful ‘and corrupt false swearing or affirming.” Under the criminal code of 1808 no penalty is fixed generally for a “wilful and corrupt false swearing.”
From the manner in which the indictment is framed, it is apparently the view of the pleader that the false swearing here prohibited is such as is embraced in the general terms of section 5, sub-division 6 of the Code. .The allegation in this indictment, in strict reference to the occasion of the oath, as distinct from its matter, is that L. G. Dennis, * * * being required by law to take an oath,” and section 5 referred to above provides that “whoever bejng authorized or required by law to take an oath or affirmation, wilfuly swears falsely,” &c. Now, if th¿'wilful and corrupt false swearing” intended by section 1 of sub-division 15 of the Code is the “wilful false swearing” mentioned in section 5, then the allegation “being required by law to take an oath,” &c., is an allegation in the words of the statute so far as that language describes the occasion of the oath. If, however, there is a difference in wilful false swearing and wilful and corrupt false swearing, then the statute does not embrace “wilful and corrupt false swearing,” and the rule as to the necessity for alleging the occasion of the oath and all other matters in connection with the crime, must be determined by reference to a correct definition of a “corrupt and false swearing,” as used in section 1, sub-division 15, where no such precise crime is created by any other statute. Our inclination is to the view that the sufficiency of the indictment must be determined strictly with reference to the provisions of section 1, chapter 15 of the Code; but, however this may be, we are of the opinion that in either case a distinct allegation of the occasion of the oath is necessary, and that in this case no such sufficient allegation is made.
There are two occasions under the statutes of this State upon which an oath touching a person’s qualification as an elector may be taken. First, upon an application to register; second, in case of challenge upon an offer to vote. In either case the indictment should* distinctly allege the occasion. This indictment alleges neither, nor does it allege interrogation as to qualifications, &c., in any judicial proceeding or course of justice.
The proceeding in which the State here assumes this oath was taken was an application by the defendant to have his name placed upon the register as a voter. Upon such application, if the officer deems an oath “necessary” the law authorizes him to require of the applicant an oath to the facts which constitute his qualifications as a voter. Referring to the indictment, and recollecting the distinction between the occasion of an oath and its subject-matter and the authority of the officer to administer it and its form, it is clear that the only statement of the occasion of the administering the oath in this indictment is, the “defendant being required by law to take an oath.” This is insufficient.
Bishop, (5 Bish. C. P., 904,) treating of the crime of perjury, says the gist of the offence is the false testimony which the prisoner as a witness has given upon oath in some court of justice, and in stating things essential, which, by the common law should appear, he recites among others that “on such a day a controversy was pending before such a court.” &c. In a case in Wisconsin involving this principle, (5 Wis., 441,) the Supreme Court of that State says, “it is essential that the indictment should show that legal proceedings were pending, or that the affidavit itself was the commencement of legal proceedings.” In this case the judgment was arrested. In Regina vs. Bishop, (41 *108 Eng. Com. Law, 169,) the indictment was for perjury committed in a proceeding under the English inter-pleader act, and it was not alleged that there had been an application for the obtaining of a rule according to the provisions of that act, without which it did not follow that the proceeding was of a judicial character, and because it was not alleged that a rule had been obtained, the indictment was held bad. See also the following English cases sustaining the same principle: 8 C. & P., 119; 8 C. & P., 787; 6 A. & E., 198; 1 Dew. & Ry., 10.
In speaking of necessary matters of fact to be alleged in an indictment for perjury, based upon a statute authorizing the oath upon a named occasion, the Supreme Court of the United States, (The United States vs. Nicholson, 17 How., 911,) mention the “description of the'oath which was taken and its occasion ” The case of the Commonwealth vs. Hughes, (5 Allen, 501,) was an indictment under Chapter 163, section 2, of the general statutes of the State of Massachusetts, which is in words the same as sec. 2, sub. 6 of Chap. 1637, of the Laws of Florida, that is to say, “whoever being authorized or required by law,” &c.
The defendant there moved in arrest of judgment upon the ground, among others, that the occasion of the administration of the oath was not set forth. The court considered the point and determined, as was very proper in that case, that the occasion was alleged.
The clear presumption from the manner in which the case is treated is that the court deemed this a fact necessary to be averred.
It is certainly unnecessary to say more in this connection. Those wishing to investigate the matter further will find the following cases as at least suggestive of the law upon the subject: 50 N. H., 249; 7 Mo., 300; 6 Yerg., 532;. 12 Mass., 283; 26 Maine, 33.
It is apparent that to remand this case with directions for a new trial would be to treat this indictment as sufficient, which it is not. The necessary order, therefore, is that the judgment is reversed; that the case be remanded with directions to enter an order arresting the judgment, and for such proceedings as are conformable to law.