## Staiar's Administrator v. Commonwealth, By, etc.

(Decided March 24, 1922.)

## Appeal from Owen Circuit Court.

1. Taxation—Domicile or Residence of Person Taxable.—The word "residence" as used in inheritance tax statutes is synonymous with "domicile," and where the statute uses the word "resident" the residence is determined by applying the principle or rule relating to domicile.

2. Taxation—Domicile or Residence of Person Taxable.—Where a party is alleged to have abandoned his domicile of origin, and to have acquired a new domicile, it is necessary to show by proof: (1) A fixed intention of establishing a permanent residence elsewhere; (2) that this intention was carried out by a removal to and actual residence at the new place selected. It goes without saying, that the change of domicile must be voluntary (i. e., a matter of choice).

3. Taxation—Domicile or Residence of Person Taxable.—Every person must have a domicile somewhere, and can have but one. The existing domicile continues, of course, until another is acquired; and whether in any given case there has been a change of domicile must be determined by the preponderance of the evidence heard on the issue.

4. Taxation—Inheritance Taxes—Domicile—Situs.—As in this proceeding under Kentucky Statutes, section 4281a-1, to recover for the Commonwealth an inheritance tax or taxes of the estate of a decedent, the preponderance of the evidence showed that he was, at the time of his death, domiciled in the city of Washington, District of Columbia, only such part of his estate, after deducting the exemptions allowed by the statute, as then had its situs in this state, was subject to such tax.

S. D. ROUSE, W. A. PRICE, C. H. SYME and J. G. VALLANDING-HAM for appellants.

CAMMACK & BAKER and H. W. ALEXANDER for appellees.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

After a residence of more than eighty years in Owenton, Kentucky, Tobias Staiar died, intestate, January 8,

1918, at the home of his daughter and only heir at law, Mrs. Kate Rousseau, wife of Lovell G. Rousseau, in the city of Washington, District of Columbia, where they had resided many years. Mary Staiar, wife of Tobias Staiar, died December 7, 1917, at about 84 years of age, and at the time of his death he lacked a few months of being 102 years of age. He had accumulated and left at his death an estate amounting to about $226,000.00, consisting of $220,000.00 in United States Government bonds, a house and lot in Owenton worth $5,000.00, two or three diamonds, furniture and other effects of the value of $1,000.00. After the decedent's death his daughter, Mrs. Rousseau, by an order of the probate court of the District of Columbia, was appointed and duly qualified as administratrix of his estate, and by a like order of the Owen county court of this state, Lee Kemper, a resident of the latter county and state, was appointed and duly qualified as the administrator of the decedent's estate. The daughter by virtue of her appointment as administratrix took charge of the decedent's personal estate in the District of Columbia, and Kemper, under his appointment as administrator, of his personal estate in Owen county, Kentucky.

This proceeding was later instituted in the Owen county court in the name of the Commonwealth by its revenue agent, W. O. Mays, under Kentucky Statutes, section 4281a-1, against Lee Kemper, as administrator of Tobias Staiar's estate, Kate Rousseau, the latter's daughter and only heir at law, and L. G. Rousseau, her husband, to collect of Staiar's estate an inheritance tax, or taxes, claimed to be due therefrom, upon the assumption that he was a resident of and domiciled in Owen county, this state, when he died. The defendants filed a general demurrer to the statement setting forth the plaintiff's claims, which the county court overruled. The defendants then filed joint and several answer, which traversed the averments of the statement and, in addition, substantially alleged that the decedent, Tobias Staiar, died a resident of the city of Washington, District of Columbia, where he had previously removed and in good faith permanently established his domicile, and that the whole of his estate, except the house and lot in Owenton, Kentucky, and the furniture of the house, was at the time of his death, and continuously since the happening of that event, situated in the city of Washington, District of Columbia, and for these reasons is not subject under the

laws of Kentucky to an inheritance tax or taxes in that state. The affirmative matter of the answer was controverted by reply, and with the issues thus completed the case went to trial in the county court, which resulted in a judgment sustaining the plaintiffs' contention and awarding them in behalf of the Commonwealth of Kentucky $6,962.20 as the total amount of inheritance tax, including interest and penalty, recoverable out of the estate of the decedent, Tobias Staiar.

From that judgment the defendants duly prosecuted an appeal to the Owen circuit court, and on the trial in the latter court the plaintiffs again obtained judgment, the amount of inheritance tax thereby recovered, including interest and penalty, being $7,300.00. The defendants filed motion and grounds for a new trial, but the motion was overruled by the circuit court; excepting to which they prayed and were granted an appeal from its judgment to this court.

There appears to be no disagreement between the parties as to the correctness of the amount of the inheritance tax, interest and penalty imposed by the judgment of the circuit court, if such tax is legally collectable. The controversy is as to whether the estate of Tobias Staiar, deceased, is subject to such tax. If at the time of his death his legal residence was in this state the tax should be paid out of the entire estate left by him, subject to such exemptions as may be allowed by the statute imposing the tax. If his legal residence was not then in this state, only such part of the estate as may then have had a *situs* in this state and would descend under its laws to his daughter as the only heir at law, would be subject to such tax, to the extent its value might exceed the exemptions allowed by the statute of this state imposing the tax. However, we do not understand that the feature of the case last mentioned is in dispute. The sole question here involved is as to the legal residence of Tobias Staiar at the time of his death, it being the contention of the appellants (defendants in the court below) that he was then a resident of Washington city, District of Columbia, and that of the appellees (plaintiffs in the court below) that he was a resident of Owenton, Owen county, Kentucky.

The law controlling the decision of this question is so universally recognized that no material diversity of opinion can arise regarding its meaning. In Gleason and Otis on "Inheritance Taxation," 2d ed. 213, it is said:

"The word 'residence' as used in the inheritance tax statutes is synonymous with 'domicile;' and although the statutes use the word 'resident' the residence is determined by applying the principle relating to domicile."

Before the enactment of inheritance tax statutes, both text books and courts of last resort had proclaimed certain rules for determining domicile. Mention of these rules in detail is unnecessary as they are given in epitomised form in the following statement of the law contained in Cooley on Taxation, vol. 1, p. 641:

"No exact definition can be given of domicile; it depends upon no one fact or combination of circumstances, but from the whole taken together it must be determined in each particular case. It is a maxim that every man must have a domicile somewhere, and also that he can have but one. Of course it follows that his existing domicile continues until he acquires another, and *vice versa,* by acquiring a new domicile he relinquishes his former one. From this view it is manifest that very slight circumstances must often decide the question. It depends upon the preponderance of the evidence in favor of one of two or more places; and it may ofter occur that the evidence of facts tending to establish the domicile in one place would be entirely conclusive were it not for the existence of facts and circumstances of a still more conclusive and decisive character which fix it beyond question in another. So, on the contrary, very slight circumstances may fix one's domicile, if not controlled by more conclusive facts fixing it in another place."

Intention to change one's domicile must exist in order to effect the change; therefore the acquiring of a new domicile necessarily involves an exercise of volition or freedom of choice, hence the removal must be voluntary. Our meaning is concisely stated in the following excerpt from Dicey's Conflict of Laws, 106:

"The only principle which can be laid down as governing all questions of domicile is this, that where a party is alleged to have abandoned his domicile of origin, and to have acquired a new one, it is necessary to show that there was both the *factum* and the *animus.* There must be the act, and there must be the intention. A new domicile is not acquired until there is not only a fixed intention of establishing a permanent residence in some other county, but until also this intention has been carried out by actual residence there."

It will be found from an examination of the several cases decided by this court, cited below, that the rules for determining the question of domicile set forth above have been uniformly applied in this jurisdiction. Tipton v. Tipton, 87 Ky. 245; Boyd's Exr. v. Comth., 149 Ky. 767; Semple v. Comth., 181 Ky. 679; Saunders v. City of Flemingsburg, 163 Ky. 680; Hurst v. City of Flemingsburg, 172 Ky. 126; Rudolph v. Wetherington's Admr., 180 Ky. 272; City of Covington v. Shinkle, 175 Ky. 530. It will also be found that the following additional authorities are of like effect: 19 C. J. 406-7; Ennis v. Smith, etc., 14 Howard 400; People v. Moir, 207 Ill. 180; In Re Newcomb, 192 N. Y. 238; Tally v. Comth., 103 S. E. Rep. 612; In Re Moir, N. E. Rep. 906.

Following the consideration we have given the law by which our decision of the question of residence here involved must be controlled, it only remains to apply to the evidence the rules it prescribes for determining that issue, which, after all, is mainly one of fact. Before referring to the witnesses or discussing the evidence in detail, however, it will be proper to mention certain facts which appear to be admitted by the parties to the action. The considerable estate left by the decedent, Tobias Staiar, had been accumulated through a long and, probably, uneventful life by great thrift on the part of himself and wife; and while he was not a spender of money, he could not have been called a miser, for it appears that he deprived neither his wife nor himself of any of the comforts of life and that he constantly kept employed for many years a negro servant, and frequently more than one, to do the housework, cultivate his garden and wait upon himself and wife. It appears, too, that he was not illiberal with his daughter, Mrs. Rousseau, for he purchased, several years before his death, for her use a house and lot in the city of Washington for which he paid $8,000.00, and though the title was taken to himself, the property was occupied after his purchase of it and at the time of his death, free of rent, by the daughter and her husband as a home. Mr. Staiar was a very eccentric man; would have nothing to do with banks, kept his money and bonds in a safe at his home and paid his bills in currency, taking a receipt for each payment, even if the purchase were of the most trifling character, and preserved all receipts by pasting them in a book kept for that purpose. Mrs. Rousseau, being in poor health, was

unable to be with her mother in her last illness or to attend her burial, but her husband, L. G. Rousseau, was present both at the death and burial of Mrs. Staiar, and remained with Mr. Staiar for about ten days and until the removal of the latter to the home of his daughter in Washington, to which city he, Dr. McBee, the Staiar family physician, and a negro, Manlius Netter, long a servant of the family, accompanied him, the physician and servant going at the special request and by employment of Mr. Staiar because of his extreme age and enfeebled condition. The trip was made by the party as far as Cincinnati in an automobile and from the latter city to Washington by rail. The ground was covered with snow and the weather quite cold, which caused the travellers, especially Mr. Staiar, great discomfort on that part of the trip made in the automobile, but after the arrival of the party in Washington it was not discovered by his physician that Mr. Staiar's health was materially affected by the journey.

Upon leaving Owenton Mr. Staiar removed from the safe his $220,000.00 of government bonds and diamonds which, with some money to pay the expenses of the party to Washington, he entrusted to Dr. McBee for safekeeping until their arrival in that city. He also carried with him some boxes of bed clothing and other articles and all his wearing apparel, except a forgotten light overcoat which, with a favorite chair that could not then be taken, Dr. McBee later, at his request, sent him at Washington. Following the arrival of the party at the home of the Rousseaus in Washington, Dr. McBee delivered to Mr. Staiar the bonds and diamonds he had received at Owenton, also what was left of the money given him by the latter after payment of travelling expenses, and took from him a receipt for the whole. The day after his arrival in Washington Mr. Staiar caused his son-in-law to purchase for him a small safe, which was kept in his room and in which he placed his bonds and diamonds, where they were found after his death. The servant, Manlius Netter, remained with Mr. Staiar until the latter's death, which occurred January 8, 1917, about two weeks after their arrival in Washington.

As a basis for their contention that Tobias Staiar by going to his daughter's home at Washington did not change his residence from Owenton to that city, counsel for appellees argue that his body and mind were so enfeebled by age he was mentally incapable of intelligently

determining that question for himself. This contention finds no support from the record. It does appear from the evidence that his health and strength were much impaired by age and that at times he was somewhat forgetful and even passed much of his time in sleep, but there was not a scintilla of evidence to the effect that he was mentally incompetent to determine any question affecting his conduct or self interest, and his strong will power seemed to be known to all his acquaintances. Indeed, the evidence conduced to prove that his convictions were strong and his mental grasp of his business, knowledge of his property and peculiar methods of managing both, continued to the end of his life. No expert was called to attack his mental capacity, and it is clearly apparent from the testimony of Dr. McBee, the only physician whose testimony was taken in the case, and who was the Staiar family physician for years, that he was unaware of any want of mental capacity in his aged patient that would have prevented him from understandingly making up his mind or acting in any matter affecting his life or property. In view of the foregoing facts it is manifest that the indefinite enumeration by a few witnesses of some of his eccentricities or peculiarities of habit afford no basis for the charge of want of capacity in Mr. Staiar to act intelligently or of his own volition in such a matter as the changing of his domicile.

The two witnesses whose testimony is strongly relied on by appellees to prove that in going to Washington Mr. Staiar merely went to visit his daughter and did not intend to change his domicile, are Ike Wolff, driver of the automobile in which Staiar and party were carried to Cincinnati, and Manlius Netter, Staiar's colored servant. Wolff testified that at one place on the journey the automobile stalled in the road on account of the snow, giving him much trouble to get it in motion again, and that while trying to start the car he heard Mr. Staiar say from his seat therein: "I would give $10,000.00 if I was back home;" and further, that on the night of their arrival in Cincinnati, upon going to see Mr. Staiar in his room, the latter thought he was his (witness's) brother Abe Wolff, but was told by Dr. McBee, then present, "No, it's Ike Wolff that brought us here." Manlius Netter testified in substance that he worked for Mr. Staiar many years and when the latter was getting ready to go to Washington the witness was told by Dr. McBee that Mr. Staiar wanted him to go to Washington

with him, and would not go unless witness went with him. Witness then gave his consent to go but asked when Staiar would come back, and the answer was "April or May." The witness also corroborated Wolff respecting the statement he claimed was made by Staiar when the automobile stalled in the snow on the road to Cincinnati; and further testified that Staiar said to witness during their stay at the home of his daughter in Washington, that he "would give $10,000.00 to be back home by his old drum stove" in Owenton. It appears from the testimony of Dr. McBee and Rousseau, who were in the automobile when it stalled in the snow, that neither of them heard Staiar make the statement Wolff and Netter claimed to have then heard from him, and McBee denied that he or Staiar said to Netter when the latter consented to go to Washington with Staiar that the latter would return from Washington to Owenton in "April or May."

Other witnesses introduced for appellees were Mildred Taylor and Louise Harris, both colored girls, and the latter a granddaughter of Manlius Netter. Mildred Taylor, who had at times been a servant in the Staiar family, testified that Mr. Staiar told her shortly before leaving Owenton for Washington that "he was going to see Kate." Louise Harris testified that Mr. Staiar said to her after the death of his wife that he wanted her and Manlius to go with him to Washington, but that Rousseau, who was present, said there would be no room for her. Whether he meant there would be no room for her in the automobile or in his home in Washington was not explained by the witness. She further testified that in another conversation with Staiar—but whether before or after the one above mentioned, was not stated—that he wanted her and Manlius to stay with him at his home in Owenton, and that he was going to Washington to stay until the weather got so he could come back. As it appears from the record before us that Manlius Netter has an action pending against the Staiar estate for services alleged to have been rendered the decedent by him, that fact should be considered in determining whether, through interest or prejudice, it affected his testimony in this case.

Two or three other witnesses were introduced by appellees, but the evidence furnished by them throws no light upon the question of residence involved, as it bore either upon the value of the Staiar estate, or eccentricities of the decedent, which were not peculiar to his last days,

but admittedly had been manifested throughout his long life.

In considering the appellants' evidence we find first of all that Mr. Staiar expressed four or five years before his death a desire to remove to Washington and live with his daughter. This is shown by letters from him to his daughter contained in the record, and by the testimony of Dr. McBee and others as well. Dr. McBee, besides being his family physician for years, attended to much of his business. It appears from these letters and the testimony of Dr. McBee, and, also, from letters to the daughter from Mrs. Staiar, that he was restrained by her from taking up his residence with the daughter before his wife's death, she alone being of the opinion that it was better for them to remain in Owenton. So it was but natural that upon the death of his wife, he at once put into execution his long cherished plan of making his home with his daughter, who, with her husband, was willing that he should do so. He therefore engaged Dr. McBee to accompany him to Washington, feeling that in his old age and feeble health, he might need his ministering care in making the journey. According to the testimony of Dr. McBee, which is uncontradicted, Mr. Staiar got him to attend to one or two matters of business in Owenton for him, one of which was the securing of a pouch in which to carry his bonds. Another preparation for his removal to Washington, in which he received Dr. McBee's assistance, was the employment of Manlius Netter to go and remain with him as a servant, that he might have his daily care. It appears, too, from the further uncontradicted testimony of Dr. McBee, and that of Mrs. Staiar's nieces, the Misses Holbrook, that Mr. Staiar, immediately after his wife's death, was bent on having a sale of his Owenton home and its contents before leaving for Washington, but that this plan was not carried into effect because of a letter received from his daughter advising against it, to which advice he yielded, telling McBee that "he wouldn't sell as long as Kate wanted it." Dr. McBee further testified, which is likewise uncontradicted, that after their arrival at the home of the daughter in Washington and the delivery to Staiar by McBee of the bonds and diamonds, he presented them to his daughter and said "they were hard earnings of him and the old queen (his wife) and he wanted to present them to her, and said he had come to make his home with her." Dr. McBee then at Mr. Staiar's request

promised to return and get him, should he conclude to go back to Kentucky on a visit, and also to bring his body back to Kentucky for burial when he died.

This is by no means the only evidence of the purpose of Staiar to fix his domicile in Washington. In addition to his immediate procurement, through his son-in-law, of a safe placed in his room in which to keep his bonds, he got the latter to write, at his dictation, a letter to the treasurer of the United States, advising him of the change of his residence to Washington and requesting him to thereafter mail to him at his Washington address, as due, the interest checks on his bonds, which were registered, instead of sending the checks to him at Owenton, Kentucky, as theretofore done. This letter containing the duly identified signature of Tobias Staiar appears in the record.

Besides the evidence in behalf of the appellants, referred to, is that furnished by the testimony of Misses Mayme Holbrook, Jessie Holbrook, Nellie Holbrook and Mrs. Yancy, all nieces of Mrs. Staiar. Miss Mayme Holbrook testified that she and her mother were left by Mr. Staiar in charge of his former home in Owenton to care for the house and contents for Mrs. Rousseau, his daughter. Miss Holbrook also testified that Mr. Staiar talked for several years before his wife's death about removing to his daughter's and would have done so before her death if she had gone with him; and that upon her death he at once began his preparations to go to the daughter with the avowed purpose to remain until his death.

The testimony of Jessie and Nellie Holbrook and Mrs. Yancy fully corroborates that of Mayme, each of them declaring that she knew from Mr. Staiar of his long cherished purpose to make his home with his daughter and of his leaving Owenton for Washington with the avowed intention of putting that purpose into execution.

The testimony of L. G. Rousseau is substantially as complete as that of Dr. McBee and the Misses Holbrook in its showing of the purpose of Staiar to fix his domicile in Washington. His testimony is strongly attacked by appellees' counsel as that of an interested witness, but if it were conceded that it should be discredited to any appreciable extent by his self interest, it yet remains true that the testimony of the other witnesses of

appellants named, together with the conduct of the decedent, the circumstances attending his departure from Owenton and the naturalness of his desire to be and remain with his only child all serve to make the evidence as a whole preponderate in favor of the appellants. There is no evidence whatever in the record tending to prove that Tobias Staiar's announced intention to change his residence to Washington resulted, as claimed by appellees, from coercion or persuasion on the part of Rousseau; and the fact that the latter remained with his father-in-law until advised by his physician that he could safely be carried to Washington, was consistent with such solicitude as would have been expected on the part of a son-in-law, rather than indicative of a purpose to compel the removal of the father-in-law to his own home. So viewing the evidence as a whole and conceding, as the authorities seem to hold, that the burden of proof was on the appellants to show that there was a legal change of the decedent's domicile from Owenton to Washington, we are constrained to hold that this was fairly shown by the weight of the evidence; and that in fixing his domicile in the latter city the decedent, Tobias Staiar, did so voluntarily and in pursuance of a predetermined purpose to do so. Hence, it follows that, in our opinion, the judgment of the circuit court is not supported by the weight of the evidence, for which reason the judgment is reversed and cause remanded with directions to that court to enter judgment only for such amount of inheritance tax, after deducting statutory exemptions, as may be due on such part of the Staiar estate as has a situs in this state. But, if no such tax be due, to dismiss the proceedings.