# JOHN W. MEAD

## vs.

# JOSEPH G. CARROL.

1. The board of judges of election created by the act of February 5, 1867, is not a judicial tribunal whose decision is final, but its acts are subject to the investigation and revision of this Court, who in a contested case may go behind the official return for the purpose of ascertaining who was really elected.

2. Soldiers of the United States army do not acquire nor lose their citizenship by reason of being stationed in the line of duty at any particular place, no matter how long their occupancy of such place may continue.

3. A person leaving temporarily and for a particular purpose, his abode or fixed habitation, as for business, pleasure, or health, with the intent of returning to the same as soon as such purpose shall be accomplished, does not lose his residence or habitancy.

4. So, soldiers and seamen may be legal residents and inhabitants of a place although they may have been absent therefrom for years, they do not lose their residence or domicil by following their profession.

Law No. 5065. Decided November 19, 1868.

Contested election case under the Act of Congress of June 16, 1868.

MESSRS. MERRICK and DAVIDGE, for petitioner.

MR. A. G. RIDDLE, for respondent.

MR. CHIEF JUSTICE CARTTER delivered the opinion of the Court:

The case before us is based upon the complaint of the petitioner that he is the duly elected successor for the fifth ward of the City of Washington, having received a majority of the legal votes polled at the election held on the 1st day of June, 1868. The undisputed facts of the case show that at the election referred to 1,920 votes were polled, of which, according to the returns of the commissioners of election, the petitioner received 972 and the respondent 940, leaving a majority of 31 for the petitioner, exclusive of 7 votes given

for Joseph Carrol, which ought to have been accredited to the vote given for *Joseph G.* Carrol, thus making the actual majority, according to the returns, 24.

This majority, in the absence of other explanation, would entitle the petitioner to the office which he claims, and raises the necessity of further inquiry into the legality of the election.   In the prosecution of further inquiry it has been objected that the return of the commissioners, based upon the list of voters furnished them by the judges of election is conclusive, behind which neither the register, in granting the certificate of election, nor this Court can go. With regard to the power of the register in the premises, it is not important for the present purposes of the inquiry to determine.   We find the certificate issued, and the respondent in possession of the office; whatever the Court may say upon this subject, therefore, is merely advisory of the future action of the register.

The law provides " that whenever any person has received, or shall hereafter receive, a certificate from the register of the City of Washington, *based upon satisfactory evidence furnished by the commissioners of election,* notifying him of his election to any elective office of said city, the person receiving such notification shall be entitled to enter upon the discharge of the duties of his office, and the certificate of the register shall be *prima facie* evidence of his election to and right to discharge the duties of said office."

It would appear from this statute that the range of this investigation and judgment is limited to the evidence furnished by the commissioners of election, and that evidence necessarily confined within the sphere of their duties.

If the objection be well founded that the Court may not go behind the act of registration, and the return of the commissioners based upon that act, the first suggestion that occurs is, that the investigation ends where it begins, and the provision of the statute of June 16, 1868, section 4—

" *And be it further enacted,* That any person who *claims,* or

shall *hereafter claim*, to be elected to any elective office in said city, may commence proceedings before *the said Supreme Court* of the District of Columbia, by petition *setting forth the facts* upon which he relies, and shall serve a copy on the incumbent or person who has received the certificate of election, and the person so served shall make answer to said petition within five days; *and said Court* shall thereupon *try* the rights of the parties to said office in a *summary* manner, and for that purpose a special session shall be called and held whenever necessary for the purposes of such trial; and the decision *of said Court* in any case so brought before it, shall be final and conclusive,"—was enacted in vain. And if this be so, this Court has no power to try the right of the parties to the office, nor is there any value in the provision that their determination shall be final and conclusive, inasmuch as the objection provides a final and conclusive judgment before the case reaches the Court. The conclusiveness of the determination of the board of judges of election in the act of registration is based upon the theory that they constitute a judicial tribunal, the finding of which is the end of the law in the matter under investigation. In this view the Court do not concur. They are in no sense a judicial tribunal. They are simply organized to discharge the duties of the officers of election, as they have been exercised and understood by similar officers under the name of judges or inspectors of elections hitherto charged with the duty of receiving legal votes and rejecting illegal ones. This is made apparent in the law of their creation, "section three of the Act of February 5, 1867," which simply makes it their business to prepare a list of " *qualified* " voters, to be used at the election. If a judicial tribunal, they are such without parties and without process, or any other of the exact and reliable instruments of justice. If the case was left to rest upon reasons to be derived from the nature and character of their duties, there would be no doubt in our minds, that the judges of

election do not come within the character of a judicial tribunal, and that their acts are subject to an examination by the Court in all cases of contest. But the question does not rest here. The Court are not without the aid of express authority upon the subject. The action of Congress in every case that has transpired since the organization of the Government, from the First to the Fortieth Congress, overrules the objection by sweeping away certificates, returns, and all other supervening obstacles of form and ceremony to reach the last important fact, as to which of the contestants received a majority of the legal votes, uniformly regarding the question, "who has been elected," as paramount to the formula of proof as to the election. But it may be replied to the precedents and rulings of Congress that such action is not authority for courts at law, inasmuch as that body is a law unto itself. We treat it as authority because the conclusion is essentially right.

But we are not left to the authority of Congress in enlightening the subject before us. The question is not new in the courts, as will be seen by reference to the case of Auld vs. Walton, 12th Louisiana Annual Reports, page 129, in which case, based upon a statute similar to the one before us, the Court makes use of the language:

"We view the office of registry, under this statute, as a special tribunal for the return of the right to vote in New Orleans, whose certificate is in the nature of a judgment, which is not subject to revision by the commissioners of election. We do not hold, however, the judgments of that tribunal to be without appeal. The ninth section of the act provides a mode of redress, by suit against the register, for an applicant to whom the register shall refuse a certificate. And the validity of the certificate and *the sufficiency of the proof upon which it was based may in all cases be examined upon a contest of election by the tribunals having jurisdiction of such contest.*"

Again, in the case of the Commonwealth *ex rel.* Leslie *vs.*

The County Commissioners, 5th Rawle, p. 77, the Court say: "But conceding that the commissioners have no discretion in relation to the return (a point which I shall hereafter notice), yet it is not perceived how this helps the relator's case, unless it can be shown that the return is conclusive on the Supreme Court, and that in fact there is no tribunal in the commonwealth competent to examine into and correct gross fraud or illegality of procedure on the part of the returning officer."

Then, on page 79, "without adverting particularly to the form of the return, it must be observed that two returns were made, and it was for them to determine which return was correct, or whether either of them should be received. As it is made the duty of the commissioners in a certain event to appoint. That seems necessarily to imply the power to inquire whether the event had taken place, on the happening of which it became their duty to act. It is startling doctrine that, in case of a notorious fraud, or a probable violation of the law, a constable could palm an officer on the public by the force of his return. If this be the law, it is useless to go through the mockery of an election. The constable may return whom he pleases, always taking care that his return is correct upon its face. It would be better to give the appointment to the constable at once without the useless ceremony of an election. The act admits of the construction which we have given it, nor do we perceive any danger in committing to the commissioners the power to examine into the illegality of elections conducted as this has been. The election is local, but the commissioners represent the whole country. They may be fairly supposed to be in some measure exempt from the feelings which act on the electors of the ward or township and therefore a reasonable hope may be entertained of something like impartiality. If, however, this hope should fail, the aggrieved party may resort to an information, when the *whole* case will be examined and right and justice done."

The same doctrine is asserted in the case of the Commonwealth *vs.* Francis Aglar. Thacher's Criminal Cases, p. 412; also, in the case of the Commonwealth *vs.* James Wallace, Thacher's Criminal Cases, p. 592.

Both reason and authority are, therefore, conclusive with the Court as to their right and duty to postpone all returns and certificates to the greater duty of ascertaining who was elected by the people on the occasion of the election in question. In the discharge of this duty the Court is without embarrassment. It is made to appear by uncontroverted proof that eighty-five soldiers in uniform were registered and voted. These soldiers were on duty at Russell Barracks with no other residence within the precinct where they voted than the stay of a soldier under the command of his superior. It is further in proof that all save one voted for the petitioner and against the respondent. This was in direct contravention of the law of Congress passed May 16, 1868, which provides that the first section of the act entitled "An act to regulate the elective franchise in the District of Columbia," passed January 8, 1867, " shall not be construed as conferring the elective franchise in said city on non-commissioned officers, soldiers, sailors, or marines in the regular service of the United States, stationed or on duty in said city, except such as may have become regular residents with their families in said city for one year previous to any election."

And also in violation of all the laws of domicile as laid down by the text books and the Courts. In the case of the People *ex rel.* Orman and Riley, 15th California, pages 49 and 50, which involved a question similar to the one in this case, the Court says: "

" This was a contest for the office of sheriff. The only point we think it necessary to notice is the objection to the admission of a muster roll offered to show that some contested votes at one of the precincts of the county were given by soldiers of the United States Army stationed there. The

*mere fact* that the men voting were soldiers of the United States Army did not disqualify them from voting. But they were not entitled to vote unless citizens of this State and of the county for the required period before the election; *and a mere residence or sojourn in the county in this capacity does not make them citizens or prove them to be such.*"

"The rule as fixed by the Constitution is, that the fact of such sojourn or residence as soldiers, neither creates or destroys citizenship, leaving the political *status* of the soldier where it was before." *   *   *

"It seems to us that the proof that these men were soldiers, and not citizens of the county, is very simple. It could, we presume, be easily shown that these men came into the county as soldiers, and that they have been since acting as such, and that they were not citizens of the county before; and thus the presumption would show that they were not legal voters."

Again, in the case of Cranford *vs.* Wilson, 4th Barbour, page 522, the same principle is laid down as follows:

"From the various definitions of the term residence, habitancy and domicil, and the decisions in regard to them, I think we can deduce the proposition that the term legal residence or inhabitancy and domicil mean the same thing. By legal residence I mean the place of a man's fixed habitation; where his political rights, such as the right of the elective franchise are to be exercised, and where he is liable to taxation. A person leaving such abode or fixed habitation temporarily, as for a particular purpose, either for pleasure, business or health, with the intent of returning to the same as soon as such purpose is accomplished, *does not lose his residence or habitancy* in such place of abode. The actual residence is not always the legal residence or inhabitancy of a man. A foreign minister actually resides and is personally present at the court to which he is accredited, but his legal residence or inhabitancy and domicil are in his own country.

His residence at the foreign court is only a temporary residence. He is there for a particular purpose. So soldiers and seamen may be legal residents and inhabitants of a place, although they may have been absent therefrom for years. They do not lose their residence or domicil by following their profession."

Other authorities to the same effect might be referred to, but it is unnecessary. But if there could be any question as to the legality of these eighty-five voters the whole case is relieved of any embarrassment by positive proof that the nominal majority given to the petitioner on the face of the return was more than countervailed by the votes of soldiers who had not resided within the District of Columbia, either in camp or out, for the period of one year. In fact this military vote was a flagrant fraud upon the citizens of this ward and of the City of Washington, made up, as it was, from the ballots of men who never had a legal residence in the city or ward, and who by reason of their military occupation could not acquire such a residence.

These views bring the Court to the conclusion that the petition must be dismissed with costs, *and it is accordingly so ordered.*

MR. JUSTICE OLIN, dissenting, said:

The decision of the Board of Registration upon the right of a party to vote is conclusive, unless it were fraudulently made, and then, of course, it will be void. But in this case, there is no charge of fraud, and the action of the registers being thus admitted to be in good faith is conclusive. I believe that the board erred in their view of what constituted residence under the law; but the error was an honest one, and if it could be received at all it could be only by *certiorari* or writ of error, and it is not pretended that appeals in that form are provided for.

The law provides that the board shall ascertain who are voters, and the board did so in this case. If any one doubts

the qualification of a party who asks to be registered, he is free to appear before the board and to contest his right, and the board are authorized to adjudicate the matter. In my opinion a proper construction of the force and effect of the registration act must lead to the conclusion that the board of judges is endowed with judicial power. The authorities abundantly sustain this view. It is the plain doctrine of the law, that where a duty is imposed by statute upon an officer, and he is required to decide a question, even though he is not empowered to call witnesses, yet his decision is a judicial determination. The decision made in this case by the board is as conclusive as if this Court had been made a board of registration. The decision of such a board cannot be inquired into unless there be a charge of fraud. It has been said that only the proceedings of courts of record are to be held thus sacred; but the doctrine applies not only to courts of record but even to justices of the peace whenever they are invested with plenary powers over the subject-matter on which they act. There is no doubt that so far as the right of the voter to cast his ballot is concerned, all parties are concluded by the determination of the board of registration.

What is the duty of the register? It is plainly settled by the law. Upon receiving the returns of the commissioners of election the law directs him to issue the notice or certificate to the person whom those returns show to be elected. Instead of doing that in this case, he gives his opinion that the person shown by the certificate to be elected is not entitled to vote and thus undertakes to constitute himself just such a court as my brethren are holding; he writes certificates and affidavits, and gravely comes to the conclusion that Carrol should be elected and not Mead.

This is a very gross error. The law plainly provides that he shall look only at the return of these commissioners of election; and from them, ascertaining who was elected, send notice to the party thus elected. The law expressly con-

fines him to the evidence presented by the commissioners' return.

The affidavits of the separate commissioners are not to be taken into account at all; the commissioners could only act jointly. Their separate affidavits are entitled to no consideration, much less to be considered as amended returns. They had already declared in their certificate that Meade was elected, and there their powers ended.

As to the question of residence, I understand the law to mean simply this: that where a man comes into this District with the intention of making this his home or residence and in pursuance of that intention remains here a year, he is then a qualified voter. On the contrary, if he comes here for a merely temporary purpose, as the clerks do in the Departments, to fulfill official duties, although he may remain here for years, he never becomes a citizen. The board of registration seem to think that the meaning of the word "residence" is remaining here, residing or staying here; but that is not the meaning of the law at all. A man may stay here for years without intending to become a citizen, and he never becomes a voter. Many of the clerks in the Departments have not changed their residence at all, but return annually, to cast their votes at their actual places of residence, and are relieved from the Departments for this purpose.

I feel compelled to express my extreme disapproval of the marking of ballots in this case. I think it a grave and gross outrage. The distinguishing feature of a vote by ballot is its secrecy. This is laid down by every writer on elections. It has been held over and over again that an elector can not be called on to say for whom he voted, and every shield which the law can throw around the secrecy of the ballot has been placed around it. Remove the secrecy and the vote by ballot is practically abolished.