## SWEENEY v. DISTRICT OF COLUMBIA.
### No. 7361.

United States Court of Appeals for the District of Columbia.

Decided March 11, 1940.

Writ of Certiorari Denied May 20, 1940. See 60 S.Ct. 1082, 84 L.Ed. ——.

Joseph A. Cantrel and James J. Sweeney, both of Washington, D. C., for petitioner.

Elwood H. Seal, Vernon E. West, and Glenn Simmon, all of Washington, D. C., for respondent.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The question presented is whether petitioner is subject to the tax on intangible personalty imposed by Sections 754 and 756, Title 20, District of Columbia Code.[1] He paid assessments for 1938 and 1939 under protest, claiming that his domicil has been at all times in Boston, Massachusetts. The Board denied his claim for refund, holding that he was domiciled on the taxable dates in the District. It also increased the assessments to include taxes on funds and securities, petitioner's ownership of which was disclosed only at the hearing, and imposed penalties for nonpayment of the increases when due. This action is not contested except as it also is involved in the question of domicil. The appeal is from the Board's decision so rendered.

Petitioner was domiciled in Boston in 1918, when he first came to the District as a member of the military service of the United States. Since his discharge here in 1919, he has resided continuously in the District. He married in 1924, and since 1933 he and his wife have maintained their only domestic establishment in a rented apartment which respondent contends is their legal domicil. He has been employed continuously by the Federal Government, as a Civil Service employee until 1928, since then as an attorney in the Department of Justice under appointments some of which were limited in duration. He has at all times by word and act steadfastly maintained that his permanent home, legal residence and domicil are in Boston, and has declared repeatedly his intention to return on expiration of his public service here, with a view to running for public office or seeking a judicial appointment in his home state. He asserts that he has resided here at all times only temporarily in order to discharge his governmental duties, always with the intention of returning home on their completion and never with that of living permanently in the District or making it other than a place of sojourn or temporary abode as required by his duties.[2]

On the other hand, respondent says that petitioner's long-continued residence in Washington has ripened into domiciliary

[1] The language of the sections follows:

"754. *Exemptions, etc., from taxation of personal property; rate of taxation.* * * * The moneys and credits, including moneys loaned and invested, bonds and shares of stock (except the stock of banks and other corporations within the District of Columbia the taxation of which banks and corporations is herein provided for) *of any person*, firm, association, or corporation *resident* or engaged in business within said District shall be scheduled and appraised in the manner provided by section 753 of this title for listing and appraisal of tangible personal property and assessed at their fair cash value, and as taxes on said moneys and credits there shall be paid to the tax collector of said District not less than five-tenths of 1 per centum of the value thereof. * * * (July 1, 1902, 32 Stat. 618, c. 1352, sec. 6, par. 2; Sept. 1, 1916, 39 Stat. 717, c. 433, sec. 11; Mar. 3, 1917, 39 Stat. 1046, c. 160, sec. 9; June 29, 1922, 42 Stat. 669, c. 249; July 3, 1926, 44 Stat. 833, c. 759, sec. 4.)" (Italics supplied)

"756. *Resident of the District of Columbia defined.* Any person *maintaining a place of abode* in the District of Columbia on the 1st day of July of a taxable year, and *for the three months prior thereto, shall be considered as* a resident for the purpose of assessment on intangible property wherever located, *unless* evidence shall be submitted to the assessor of the District of Columbia, satisfactory to him, that such intangible personal property or the income thereof is taxed to said person *in some other jurisdiction,* or that the assets of a corporation or association represented by shares or certificates constituting such intangible personal property are taxed by the State in which such corporation or association is chartered or organized and in which such person has a *legal residence,* in lieu of a tax upon such shares or certificates: *Provided,* That Cabinet officers and persons in the service of the United States Government elected for a definite term of office shall not be considered as residents of the District of Columbia for the purposes of this section. (July 3, 1926, 44 Stat. 833, c. 759, sec. 2; Feb. 18, 1929, 45 Stat. 1227, c. 259, sec. 4.)" (Italics supplied)

[2] Further factual details may be stated. Petitioner resided and was domiciled in Boston from his birth in 1891 until 1918. In the latter year his home was with his mother in a rented apartment at 467 Tremont Street. It has not been occupied by him or any member of his family for several years, but he claims his domicil has remained at that address.

His Civil Service appointment, presumably, was under Massachusetts' quota. Cf. 5 U.S.C. (1934) § 633, 5 U.S.C.A. § 633. He has declared Boston his

change; that his home, principal headquarters and only domestic establishment are here; that he has no other in Massachusetts or elsewhere; that his motive in remaining here to take and perform work is immaterial, as are the facts that it is governmental and that the situs of performance is the national capital. It is urged that his subjective intention to retain his legal domicil in Massachusetts cannot overcome these facts and amounts to no more than a "floating intention to return to his former place of abode at some future period," which "will not defeat the newly acquired residence or the rights and obligations which attach to it."[3] It is said also that the Board has found as a *fact* that petitioner's domicil was in the District on the taxable dates, and that the finding is conclusive as being supported by substantial evidence. Both parties have proceeded on the theory that domicil in the legal sense is the fulcrum of the tax.

The question in the present case concerns a Federal employee. That only Federal officials can determine it creates an embarrassment from which escape would be desirable. But a doubtful escape in order to avoid the embarrassment merely would create a greater one.[4]

■ We do not consider the Board's finding conclusive. Domicil is a compound of fact and law. When there is no question concerning the applicable law and conflict concerns only the facts, the Board's determination is conclusive if sup-

ported by substantial evidence. But where, upon admitted or undisputed facts, the decision turns on controverted legal principles, it is reviewable. Here there is no dispute as to the essential facts. The conflict relates only to their legal effect. That is true though opposite inferences are drawn as to petitioner's intent. The difference is not as to what he intended in fact, but as to whether that intent can be given the legal effect which he claims for it. The Board's decision, therefore, is reviewable.

■ The tax-imposing provision is Section 754. It lays the tax upon "the moneys and credits * * * of any person * * * *resident* or engaged in business within said District * * *." (Italics supplied) Section 756 specially defines "resident" for purposes of the assessment and creates exemptions.[5] The statute carefully avoids using "domicil." But clearly it applies to persons domiciled in the District. Section 754 was the general, not a special, taxing act as to intangible property. The term it uses is "resident." Without more, its normal and usual meaning is "domiciled."[6] That is true as to both inclusive and exclusive function. The section, therefore, unaided by Section 756, would tax domiciliaries and no others.

As the case has been presented to us, we are not required to determine whether Section 756 was intended to extend the tax to others than those already taxed by Section 754. Respondent, for its own purposes (cf. note 20, infra), has conced-

---

legal residence consistently in correspondence, tax returns, his will, applications for work, Civil Service records and documents and those of the Department of Justice. He has voted annually in Massachusetts; paid poll taxes there; returned annually to spend time with relatives and friends; used the Tremont Street number as a mailing address. He owns no property physically located there; nor until after the taxable dates did he make a state income tax return, apparently because his salary was not then regarded as taxable by the state. He has no tangible property in the District except household goods and an automobile, which is registered here. He has kept his securities and funds in a Baltimore bank. There is nothing to show he has remained in Washington for any other purpose than to discharge his governmental duties or that he would have done so if they had terminated. There

is evidence, principally his own declarations, that on one or two occasions he contemplated returning to Boston when it was expected his service here would terminate.

[3] Bradstreet v. Bradstreet, 1889, 7 Mackey (18 D.C.) 229.

[4] Cf. Evans v. Gore, 1920, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887, 11 A.L.R. 519.

[5] The language of the section is set forth in note 1 supra. The statute has been repealed (Revenue Act of July 26, 1939, 53 Stat. 1107, c. 367, Tit. IV, § 1), being replaced by other legislation (District of Columbia Revenue Act of 1939, July 26, 1939, 53 Stat. 1085–1119, c. 367).

[6] In re Moir's Estate, 1904, 207 Ill. 180, 69 N.E. 905, 99 Am.St.Rep. 205; Staiar's Adm'r v. Commonwealth, 1922, 194 Ky. 316, 239 S.W. 40; People v. Platt, 1888, 50 Hun 454, 3 N.Y.S. 367.

ed that the assessments were invalid if petitioner was not domiciled in the District on the taxable dates.[7] Nor is the case rested upon the special definition contained in Section 756 as having either presumptive or conclusive effect in determining domicil.[8] As presented, therefore, the issue is one of general, not special, domicil.[9]

So considered, we think petitioner's domicil has remained in Massachusetts. It was there in 1918 and concededly for some period after his removal to Washington. Respondent fixes upon no specific date for a later shift, but asserts merely that it occurred some time prior to 1938.[10]

Traditional formula requires conjunction of physical presence and animus manendi in the new location to bring about a domiciliary change. There is no question here concerning the former—conflict is confined to the element of intent. As presented it takes two forms: (1) whether, disregarding the nature of petitioner's work and its situs, a sufficient intention is shown by the facts; (2) whether the character of his duties and the situs of performance make the case different from one of private employment here or elsewhere. Respondent asserts that Federal employment in the District is not different, for purposes of determining domicil, from any other and therefore that that element in the case is immaterial except as it may bear factually upon the existence of domiciliary intention just as private employment under like circumstances would do. It is claimed also that, so considered, the facts establish the domiciliary change.[11] Petitioner takes the contrary position on both contentions.

In the view we take of the case, we do not undertake to determine whether petitioner would be domiciled here if he had

[7] On the theory that Section 756 would be invalid if construed to impose the tax upon persons not domiciled in the District, based upon inferences drawn from First National Bank v. Maine, 1932, 284 U.S. 312, 52 S.Ct. 174, 76 L.Ed. 313, 77 A.L.R. 1401; Farmers Loan & Trust Co. v. Minnesota, 1930, 280 U.S. 204, 50 S.Ct. 98, 74 L.Ed. 371, 65 A.L.R. 1000; Baldwin v. Missouri, 1930, 281 U.S. 586, 50 S.Ct. 436, 74 L.Ed. 1056, 72 A.L.R. 1303; Beidler v. South Carolina Tax Commission, 1930, 282 U.S. 1, 51 S.Ct. 54, 75 L.Ed. 131. Later decisions throw some doubt upon the limitations apparently imposed by these cases. Curry v. McCanless, 1939, 307 U.S. 357, 59 S.Ct. 900, 83 L.Ed. 1339, 123 A.L.R. 162; Graves v. Elliott, 1939, 307 U.S. 383, 59 S.Ct. 913, 83 L.Ed. 1356; Worcester County Trust Co. v. Riley, 1937, 302 U.S. 292, 58 S.Ct. 185, 82 L.Ed. 268; Texas v. Florida, 1939, 306 U.S. 398, 59 S.Ct. 563, 830, 83 L.Ed. 817, 121 A.L.R. 1179. In accordance with respondent's theory, therefore, "maintaining a place of abode" means "domiciled."

[8] Construed as a conclusive definition of domicil for purposes of the tax, the section would have the same practical consequences as if construed to tax non-domiciliaries circumstanced as required by its terms. Each view would raise difficult questions, to some extent identical, which respondent's concession relieves us from considering. Cf. note 7 supra. Construed as having merely prima facie effect, the definition would avoid these difficulties, but would add little to the District's revenues.

[9] We are not required, therefore, to determine whether the legislature could foreclose inquiry into general domicil (i. e., as a constitutional condition for application of the statute to petitioner) by the special statutory definition of persons "to be *considered as* residents *for purposes of the assessment.*"

[10] Adopting, apparently, the contemporaneous approach said to be preferable to that which traces domicil chronologically from the cradle to the grave, or other material event. Cf. 53 Harv.L.Rev. 87, 88 (loc. cit.). Respondent does not contend, therefore, that the shift occurred when, or until after, petitioner entered the Civil Service about 1919.

[11] Respondent does not deny that petitioner's intention was to return to Massachusetts on completing service here or that it was honest and real. Cf. 306 U.S. loc. cit. 411, 425, 59 S.Ct. 563, 830, 83 L.Ed. 817, 121 A.L.R. 1179. It is urged, however, that it could not prevent a change of domicil in the circumstances. There was also, it is said, an intention to remain here during such service, which in part was indefinite in duration. This intention rather than the former is claimed to be controlling. So put, the issue involves a conflict between two intentions, neither simulated. Resolving it would require definition of the element of permanence in animus manendi, as to which there is much uncertainty. Cf. 53 Harv.L.Rev. 83, 86; 306 U.S. 431, 59 S.Ct. 563, 830, 83 L.Ed. 817, 121 A.L.R. 1179; and note 26 infra.

come or had remained in order to accept private employment or engage in private business. Boiled down to its essence, the question here is whether a citizen and resident of a state must surrender his state allegiance for all the purposes in which domicil may be controlling when he accepts Federal employment in the District of indefinite or relatively permanent duration.[12] The question is not whether he may do so if he wishes. To hold that he must would create startling consequences, including unjust and untenable, not to say intolerable, discriminations.

Some of them may be shown by illustrations stated in the briefs or at the argument. Military and naval men, it was conceded, would retain domicil in the state of residence at the time of appointment.[13] This, regardless of length of absence from and lack of a domestic habitation in the state, presence of one here or length of residence in the District. As to them the presumption of continuity remains in full force. Likewise with elected officials, the President, the Vice President and, normally, members of Congress. So also with cabinet officers and persons holding only short-term or temporary appointments in executive, administrative and Congressional services. These, it is said, either by reason of their limited tenure and consequent assumed brevity of service or, in the military branches, because of its assumed compulsory character and regardless of its permanence, occupy special and preferred status which prevents applying to them criteria normally appli-

cable to all others. In contrast with them, it is said, are members of the Supreme Court and other distinctively Federal courts sitting in the District,[14] members of administrative tribunals enjoying long, though not unlimited tenure,[15] Civil Service employees, and all others whose tenure is indefinite or is not limited to a short term. As to these the argument is carried to the full length of the logic implicit in the premises. It is that upon appointment and establishment of a place of abode in the District, whether it be their only or merely their principal one, with intention to remain indefinitely for the discharge of their duties and only a so-called "floating" intention to return on their completion, they lose domiciliation in the state and become domiciled forthwith in the District. The conclusion is applied even to Senators and Congressmen in the not infrequent cases of those who succeed, practically speaking, in establishing an indefinite tenure and, resting upon the demonstrated confidence of constituents, maintain their only or principal domestic establishments here.[16] In short, except for the comparatively small group of military men, elected officials and temporary employees residing in the District, the principle would deprive of state domiciliation and impose that of the District upon all Federal officials and employees required to live here in order to perform work without which the Government could not go on. That such a consequence might be desirable as a matter of District taxing policy cannot outweigh the havoc it would work in other

---

[12] It is implied, of course, that the duties require his physical presence here for the greater part of the year (normally all of it except annual leave) and that he maintains some kind of "place of abode" for purposes of residence while discharging them.

[13] Mead v. Carrol, 1868, 6 D.C. 338; Sealey v. United States, D.C.E.D.Va., 1934, 7 F.Supp. 434; Harris v. Harris, 1927, 205 Iowa 108. 215 N.W. 661; Radford v. Radford, 1904, 26 Ky.L.Rep. 652, 82 S.W. 391; McLaughlin v. Feerick, 1931, 276 Mass. 180, 176 N.E. 779; Gallagher v. Gallagher, Tex.Civ.App., 1919, 214 S.W. 516; 1 Beale, Conflict of Laws (1935) § 21.2.

[14] United States Court of Customs and Patent Appeals; Court of Claims of the United States; District Court of the United States for the District of Columbia; and this court.

[15] E. g., Comptroller General and As-

sistant Comptroller General (15 years); Board of Tax Appeals (12 years); Federal Reserve Board (12 years); Federal Communications Commission (7 years); Federal Trade Commission (7 years); Interstate Commerce Commission (7 years); Tariff Commission (6 years); Comptroller of Currency (5 years); National Labor Relations Board (5 years); Securities and Exchange Commission (5 years); Power Commission (5 years); Railroad Retirement Board (5 years).

[16] Economic pressure forces some to give up maintenance of an establishment at home. That others are able to maintain two, one at home, one here, does not avoid the problem, but merely gives it the form of determining which is the principal one. According to the argument here and the theory on which it is based, that would be the one occupied for the greater part of the year, ordinarily that located in the District.

respects. Without regard to constitutional considerations,[17] the system would be strange which would permit or require state domiciliation for elected legislative and executive officials and deny it automatically to coordinate judicial officers or compel them to maintain it by residing outside the District and in a state not otherwise of their choice. Equally, if not more, strange would be one so capable of discriminating, in practical consequences and legal effects, between the high and the low, the well-to-do and the poor in the Federal service. If such a price were placed so broadly upon the acceptance of Federal duty, the consequences would be entirely unpredictable, whether for the Government or for the individuals immediately concerned. Many would accept it of necessity. Others would not do so for any preferment. State attachment is not incompatible with Federal service. On the contrary, it remains a compelling allegiance, secondary only to national loyalty, not merely for a few, but for all Federal servants who do not prefer District domiciliation. Our dual system contemplates a harmony, not an antagonism, of state and national allegiances. Each is the complement, not the antithesis, of the other. A rule which would compel surrender of the one in order to exercise the other fully would be inconsistent with these principles.[18] Creation of a vast army of Federal officials and employees

detached from the states in all of the civil and political relations which domicil sustains is not a thing desired or desirable, whether regarded from the point of view of the Government, the states or the individuals. That connection with the home community is a key pin in the structure of the dual system. It should not be weakened or destroyed, as it would be by acceptance of respondent's view.

■ These considerations, standing alone, are sufficient to sustain our conclusion. But partial escape from the consequences of respondent's position is sought in recourse to an asserted distinction between civil and political domicil. Political citizenship, it is said, is distinct from civil domiciliary status, and therefore we need not concern ourselves with the former. The distinction may be admitted, but not to the extent or with the consequences claimed. Distinct the two conceptions are, but they are not entirely independent. For some purposes, it is true, state citizenship may be conferred without reference to domiciliation. But that is not to say that such purposes are many, that the citizenship so created is full-grown, or that it is in fact frequently conferred. The contrary is the case.[19] That the suggested distinction is more theoretical than practical, argumentatively specious than safely tenable, is shown by this widespread practice. In effect, this is admitted by re-

[17] Entirely apart from discrimination between elected officials and coordinate judicial officers, it may be questioned whether Congress has power, directly or indirectly, to require surrender of state domiciliation and correlative citizenship as a condition or consequence of holding Federal office or employment.

[18] The argument appears to invest the District with something of the status of a state, to the extent at least of assuming that the considerations controlling change of domicil from state to state for non-Federal purposes apply with equal force to change from a state to the District expressly for Federal purposes. Whatever may be the principles or policies underlying the asserted relaxation of the presumption of domiciliary continuity on removal of residence from state to state (cf. 53 Harv.L.Rev. 86, 83 note 45), we think they are inconsistent with the purpose and character of the District as the seat of the national government, and therefore the most distinctively and exclusively national place within the Union, as applied to state domiciliaries in the Federal services. There is in no true

sense a new and conflicting state or local allegiance such as characterizes removal from state to state. Undoubtedly one of the controlling considerations underlying the Constitution's failure to prescribe or guarantee for the District the status of a state and for its residents that of state citizenship was the assumption, not widely questioned until recently, that Federal officials and employees would bring with them and retain their state citizenship while performing their duties here. That assumption is consistent with the dual form of government, the exclusively national character of the place, and the absence of a conflicting comparable local citizenship. Many of the considerations which dictated application of the presumption of continuity of English domicil by the English courts to colonial officials apply with equal force to Federal employees residing in the District for Federal purposes.

[19] Cf. 1 Beale, Conflict of Laws (1935) § 41C.7; Note (1925) 37 A.L.R. 138 (indicating that most states require domicil for voting and have constitutional provisions preventing loss of "residence" for

spondent's further argument, made in answer to petitioner's claim of jeopardy here to his political status as a citizen of Massachusetts, namely: "It may be that petitioner, in voting in Massachusetts under the claim that he is a resident of that State and maintains a residence in an apartment house in which he has no place of abode, may be perpetrating a fraud upon the law of Massachusetts."[20] The effect of the concession cannot be wiped out merely by asserting that "that question is not before this court."[21]

Equally untenable in principle is respondent's position insofar as it attempts to distinguish between military men, elected officials and others, on the one hand, and judicial officers, administrative officials and indefinitely employed minor officials and workers, on the other. The difficulty is to find a consistent principle of differentiation. If permanence or indefiniteness of term is controlling, judicial officers and civil servants, for instance, might be distinguished from the elected officials and cabinet officers. But the distinction breaks down in relation to military and naval officers. To meet the breach resort is had to a theory of compulsion. Their residence here (or elsewhere), it is said, is not voluntary—they have no other choice. But this confuses choice as to maintaining a place of abode with choice of personal presence in order to perform duty. At the cost of separation from their families, homes could be maintained in the state of appointment just as they could by civil servants. But in the one case as in the other, the price would be prohibitive for the great majority. Further, the two groups have the same choice as to entering the service and many members of both as to leaving it. Officers may resign, though enlisted men ordinarily must serve out their limited terms. In effect all respond to the same fundamental compulsions as do civil servants on entering, and officers do so by remaining, in the service. We fail to see, either in compulsion or in length or definiteness of term how they occupy status in respect to loss or acquisition of domicil basically different from that of permanent civil officers and servants. If actual length of service and residence here supplants definiteness of term, the senior Senators and Congressmen may find themselves destated, and therefore ineligible to hold their offices. Constitution, Art. I, Secs. 2, 3. If election as against appointment turns the scales, they will retain domicil at home, while their secretaries and clerks acquire status as residents of the District, although their tenures are identical.

■■■ These incongruous discriminations disclose the inadequacy of their foundations. But apart from them we are unwilling to accept a principle implicit in which are consequences so questionable for the national services and welfare and so contradictory of the dual system which postulates allegiance to nation and state. That the consequences of acceptance would be so largely indeterminate or that partial escape might be found by tortuous methods of individual adjust-

---

voting purposes by absence in Government service).

Taxable status is merely one consequence of a domiciliary determination. Other civil, as well as political, rights and duties turn upon it. To the extent that domicil rules them, such a determination has the effect of stare decisis, but not of res judicata, though the immediate consequences may be distinct, in subsequent litigation. The citation of domiciliary decisions without discrimination as to the particular consequences involved in those cited and the pending case is a common, if not universal, practice. Whether it is merely indiscriminate or represents a considered rejection of the special domiciliary theory in an inappropriate application (Cf. notes 8, 9 supra), the practical result is to make the domiciliary determination involving one particular consequence effective, or at any rate affective, as to another.

[20] The argument either confuses maintaining domicil with keeping a place of abode, or, more probably, assumes the point at issue in asserting their identity and ignoring or repudiating the presumption of continuity. The admission is consistent with respondent's basic position, namely, that general, not special domicil as defined in Section 756 is involved. What is sought is not a special definition for purposes of applying the Act now repealed, but a new definition of general domicil which will apply to it and other statutes. We cannot, therefore, assume that the effects of the decision will be limited to this statute or to taxing acts, or therefore that political rights may not be affected.

[21] Cf. notes 19, 20 supra. Nor is the possibility of affectation of other interests negatived, on the contrary it is magnified greatly, by the uncertainties characterizing the application of domiciliary theory. Cf. note 22 infra.

ment or legalistic interpretation does not add to the force of the argument.[22] The controlling consideration is found, we think, not in the length or definiteness of term, nor in election as against appointment, nor in any compulsion peculiar to military men. It is in the fact that Federal duty requires residential presence in the District. That is true, not merely of some particular officer or officers, but of all who must come and remain here to do the work of the Government. It is true whether the service is short or long, definite or indefinite in term, appointive or elective, civil or military, in high or modest place. Residence here during the term of duty is reasonably incident to its performance. The opportunity to discharge it is not to be purchased at the cost of separation from family. Nor, because the separation is avoided, should the

avoidance be visited with the penalty of severing state allegiance or making it dubious. No such dilemma was contemplated by the Constitution or by the statute. Accordingly we think that one who comes to the District and remains to render service to the Government which requires his presence here, may retain his domicil in the state from which he comes until the service terminates unless he gives clear evidence of his intention to forego his state allegiance. This conclusion, we think, is supported by sound policy, the clear weight of judicial authority,[23] many instances of Congressional recognition in principle,[24] and the long-established custom and practice of other officials and departments.[25] Whether the principle is stated in terms of a presumption of continuity of state domiciliation[26] during the Federal employment or of priv-

---

[22] Cf. Tweed and Sargent, Death and Taxes Are Certain—But What of Domicile (1939) 53 Harv.L.Rev. 68; also notes 9–11 supra. Uncertainties in the conception of domicil itself are magnified in application by the difficulties of proof and the ease with which "a small change of portions in the admixture" (306 U.S. 431) or in emphasis upon one portion as against another brings major changes in legal consequence (cf. 53 Harv.L.Rev. 86). Added effect is given by breaches in the common-law tradition of unitary domicil created by operation of other conceptions, notably res judicata, full faith and credit, and ideas of state sovereignty and limited federal judicial power [cf. Texas v. Florida, 1938, 306 U.S. 398, and the dissenting opinion page 428 ff., 59 S.Ct. 563, 830, 83 L.Ed. 817, 121 A.L.R. 1179], as well as the apparent inconsistency, for jurisdictional purposes, of special and general domicil. Cf. note 9 supra.

[23] Deming v. United States ex rel. Ward, 1930, 59 App.D.C. 188, 37 F.2d 818; Rollings v. Rollings, 1931, 60 App. D.C. 305, 53 F.2d 917. Cf. Lankford v. Gebhart, 1885, 130 Mo. 620, 32 S.W. 1127, 51 Am.St.Rep. 585; Hannon v. Grizzard, 1883, 89 N.C. 115; Dennis v. State, 1879, 17 Fla. 389; Atherton v. Thornton, 1835, 8 N.H. 178; Thompson v. Love, 1884, 42 Ohio St. 61; Foss v. Foss, 1878, 58 N.H. 283; Venable v. Paulding, 1873, 19 Minn. 488, 19 Gil. 422; Yonkey v. State, 1866, 27 Ind. 236; Walden v. Canfield, 1842, 2 Rob., La., 466; Attorney General v. Rowe, 1862, 1 H. & C. 31, 31 L.J.Ex. 314; Carpenter v. Carpenter, 1883, 30 Kan. 712, 2 P. 122, 46 Am.Rep. 108; Houston Printing Co. v. Tennant, 1931, 120 Tex. 539, 39 S.W.2d 1089. To the contrary see Bradstreet v. Bradstreet, 1889, 18 D.C.

(7 Mackey) 229. Cf. Sparks v. Sparks, 1905, 114 Tenn. 666, 88 S.W. 173, 174, 175. See, also, 1 Beale, Conflict of Laws (1935) § 22.6.

[24] The instant statute is illustrative. Cf. note 1 supra, Section 756; text circa notes 7–9, supra. See, also, D.C.Code (1929) tit. 20, § 755, exempting personal property of persons in public service temporarily residing in the District. Cf. Act of Aug. 2, 1939, Pub. 252, 18 U.S. C.A. § 61 et seq. (prohibiting pernicious political activities by Federal employees); D.C.Code (1929) tit. 7, § 161; id. tit. 8, § 75; 28 U.S.C. (1934) § 374, 28 U.S.C.A. § 374. Cf. also the state constitutional provisions referred to in 37 A.L.R. 138.

[25] Cf. the listings of "legal residence," Official Register of the United States, 1939, passim.

[26] In Rollings v. Rollings, 1931, 60 App.D.C. 305, 307, 53 F.2d 917, 919, we said: " * * * since also a domicile once existing is not lost by mere abandonment, two things are necessary to accomplish the changed status: First, the acquisition of a new domicile; and, secondly, the intention to abandon the old and to reside elsewhere *permanently*." (Italics supplied) We there held that residence in Washington for nine years by one previously domiciled in West Virginia was not sufficient to overcome the presumption of continuity and facts, much like those presented here, evidencing intention to retain the former domicil, though it was not shown that the plaintiff intended to return to West Virginia at any particular time. In Deming v. United States, 1930, 59 App.D.C. 188, 190, 37 F.2d 818, 820, we said: "When a domicile is once established, it is presumed to continue until there has

ilege derived from the dual form of government is perhaps a matter of more theoretical than practical consequence. The privilege of course could be waived. The presumption would require strong evidence to overcome it. In either case the state domicil could not be overthrown by mere proof of long residence during performance or ambiguous showing of intention to change. The considerations which we have held controlling require that evidence of intention to change be clear and unequivocal, whether its effect be waiver of privilege or to overcome a presumption. The evidence here was not unequivocal. Except for the payment of taxes on his intangible personalty (the record does not show that Massachusetts taxes it except as to income), petitioner has done all that anyone could do, circumstanced as he has been, to maintain his state domiciliation. It follows that he was not domiciled in the District on the taxable dates and that the taxes assessed against him as a domiciliary were invalid.

We have limited the decision to the issue of domicil as it has been presented. In doing so, we express no opinion as to other issues which might have been, but were not, presented, including the questions whether Section 756 should be construed as intended to impose the tax upon persons not domiciled here but situated as was petitioner and whether, if so, it would be valid. Whether, in view of the more recent Supreme Court decisions,[27] in order to prevent the District from being made a tax-dodging refuge by Federal employees domiciled elsewhere, Congress could impose taxes upon them here conditioned upon their failure to pay like taxes in the states or might do so to some extent upon a theory of commercial or business domicil,[28] we are not required to determine. Federal legislation in aid of state policy is not a new, though it is a recently expanded, phenomenon. But these questions have not been briefed or argued. We think they should not be decided without mature deliberation on full and adequate presentation. Their importance and the doubtful character of the consequences, in addition to the lack of aid from counsel, require us to dispose of the case on the basis upon which it was presented. We therefore express no opinion concerning these questions.

In so disposing of the case, we add that the basic question here is not taxation as against escape from it. We would be reluctant to relieve Federal officials from any obligation imposed on other citizens unless required to do so by controlling authority. Such a result would be peculiarly unfortunate in view of recent decisions which have terminated formerly prevailing special privileges of some of them.[29] But such is not the issue here. The question is not whether the Federal official or employee shall or shall not pay taxes on his intangible property. It is, What taxes and to whom shall he pay them? The rule which relieves him from *domiciliary* taxation in the District subjects him to it in the state of his domicil. He is not therefore, legally or morally, placed in a preferred position. That the amount of his state taxes may be greater or less than those which would be imposed were he domiciled in the District is beside the point. Whatever the burden imposed by the state taxing statutes, that is a consequence of his domiciliation in the state and he must bear it. In view of that burden, which persons domiciled in the District are not required to bear, there is no unjust discrimination between him and them.

The decision of the Board is reversed, and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

---

been a change of residence with the intention of establishing a new domicile. But, when petitioner's father later moved to Washington to enter the government service, he expressly negatived both by word and conduct any inference that he was intending to change his domicile by reason of the removal." Cf., also, Mitchell v. United States, 1875, 21 Wall. 350, 22 L.Ed. 584, 588.

[27] Cf. note 7 supra.

[28] Cf. Curry v. McCanless, 1939, 307 U.S. 357, 59 S.Ct. 900, 83 L.Ed. 1339, 123 A.L.R. 162; Graves v. Elliott, 1939, 307 U.S. 383, 59 S.Ct. 913, 83 L.Ed. 1356; Hazen v. National Rifle Association, 1938, 69 App.D.C. 339, 101 F.2d 432.

[29] Cf. O'Malley v. Woodrough, 1939, 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289, 122 A.L.R. 1379, disapproving Miles v. Graham, 1925, 268 U.S. 501, 45 S.Ct. 601, 69 L.Ed. 1067, and questioning Evans v. Gore, 1920, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887, 11 A.L.R. 519; Graves v. New York ex rel. O'Keefe, 1939, 306 U.S. 466, 59 S.Ct. 595, 83 L. Ed. 927, 120 A.L.R. 1466.