**PACE v. DISTRICT OF COLUMBIA.**

No. 8274.

United States Court of Appeals for the District of Columbia.

Decided April 12, 1943.

Mr. Elmer E. Hazard, of Jacksonville, Fla., of the Bar of the State of Florida, pro hac vice, with whom Mr. George H. Happ, of Washington, D.C., was on the brief, for petitioner.

Mr. Glenn Simmon, Assistant Corporation Counsel, D. C., of Washington, D. C., with whom Messrs. Richmond B. Keech, Corporation Counsel, D. C., and Vernon E. West, Principal Assistant Corporation Counsel, D. C., both of Washington, D. C., were on the brief, for respondent.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

VINSON, Associate Justice.

The sole issue we are called upon to determine, in reviewing the decision of the Board of Tax Appeals in this case, is whether Charles F. Pace was, at the time of his death, legally domiciled in Florida or in the District of Columbia. There is no dispute that Florida was his domicile of origin. He was born there and it had been the home of his family for several generations. The fact that the decedent left Florida and removed to, and lived in, the District of Columbia during the last twenty-seven years of his life raises the domiciliary question.

The decedent came to the District in 1913 to enter the Federal service. Two or three years later he became Financial Clerk of the Senate, and enjoyed that distinguished service continuously until his death here in 1940. The twenty-seven years of official service here, however, are material only to the issue of the waning of a will to return, for absenteeism alone does not operate to effect a change in domicile. The Supreme Court has recently reaffirmed the long-standing proposition that mere length of time devoted to the Federal service in the District is not enough, in itself, to deprive a Federal employee of his domicile of origin, and that the intention to leave the Federal employment and return to the territorial confines of one's domicile of origin need not be related to any definite date.[1]

Were it otherwise, the rule might act as a serious deterrent in the considerations of a state citizen, justly jealous of his local affiliations, in contemplating Federal service in the District. There may be an inherent urge in man to retain allegiance to the state of his birth or choice and to be possessed of the privileges and responsibilities that come with being domiciled in, and a citizen of, that state. Ofttimes it costs added dollars yearly to retain such privileges. Many will not suffer expatriation. Especially should this feeling be recognized in the District of Columbia where the battle for the rights that go with state citizenship has been waged through decades, and is particularly acute in this era. Being citizens of the United States is not sufficient for those who fight valiantly that citizens in the District of Columbia be raised to the level of citizens in the states, with the right to vote and thereby to participate actively in national and local

---

[1] District of Columbia v. Murphy, 1941, 314 U.S. 441, 455, 62 S.Ct. 303, 86 L. Ed. 329, reversing and remanding District of Columbia v. Murphy, 1941, 73 App.D. C. 347, 119 F.2d 451, and District of Columbia v. DeHart, 1941, 73 App.D.C. 345, 119 F.2d 449.

government, and the right to possess all of the privileges valued by citizens in the states.

 Clearly, then, as long as his Federal service continued, it is immaterial, in itself, whether the decedent's residence here lasted twenty-seven days, twenty-seven years, or even longer. However, the onus of demonstrating the continuing character of the state domicile has been placed upon the Federal employee.[2] He must carry the burden of proving that his residence here is of a transitory nature, as a convenience or necessity to, and roughly coterminus with, his Federal service.[3] The presumption of continuance of domicile of origin has given way to the counter-presumption of domicile in the territory in which one is resident until the contrary has been demonstrated. But it is open to the party whose domiciliary status is challenged to offer evidence of continuing affiliation with the state from whence he came to explain away the prima facie presumption which rises from his residence in the new political jurisdiction.

This review, therefore, merely poses the question whether those representing the decedent have carried the burden of showing that he intended to return to Florida at such time as he should decide to terminate his Federal service. In order properly to determine this question, we must examine with particularity the evidence relative to his intent:

Although the decedent sold the family homestead in Starke, Florida, when he left there, and had since owned no home or other place of residence in Florida, his furniture and household goods were stored in a warehouse in that State maintained by him for this purpose, and they remained there until his death. During his twenty-seven years of residence in the District, the decedent lived in rented apartments and in boarding houses. He owned no real property here. At many times during his Federal service, he was urged by his brother and sisters, who had removed to the District earlier than the decedent, to purchase a home here, but he resisted their persuasion successfully, stating that he did not want to make his home in Washington, that he would return to Florida at the termin-ation of his Federal service. There was uncontradicted evidence that upon several occasions the decedent had expressed a desire to retire and return to Florida, but had been persuaded by his friends in the Senate not to do so. On one occasion, when his friends sought permission to urge his appointment to another high governmental position, he requested them not to do so, explaining that he did not want to establish his home in the District.

When he left Florida in 1913, the decedent owned several pieces of real property in that State. From time to time during his service here, he acquired more. At the time of his death, he owned a number of business, residential, and farm properties in Bradford, Clay, and Duval counties in Florida, valued at approximately $30,000, and owned notes secured by Florida real estate in Clay and Duval counties, valued at over $28,000. His business affairs in Florida were handled through attorneys and agents there. The decedent owned also, at the time of his death, intangible assets valued in excess of $250,000, consisting largely of United States Treasury bonds and Consolidated Federal Land Bank bonds, which he kept with him in the District of Columbia. At that time he had a substantial sum on deposit in an active bank account in Florida, namely, $8,416.79, while in a bank in the District he had a deposit of $189.32.

At all times the decedent was registered and qualified to vote in the State of Florida. He exercised this right either in person or by absentee ballot. In voting by absentee ballot, it was necessary that he take oath that he was a legal resident of Florida. Throughout the years he paid the Florida poll tax. This was a prerequisite for voting until 1937.[4]

The decedent did not belong to any civic or social clubs in the District, but he did become a member of a local church. However, in oral argument counsel for the respondent expressly agreed that no weight or significance as affecting domicile should be attached to this church membership. The evidence shows that the decedent had no marked interest in District affairs. On the other hand, it was demonstrated without contradiction that he had a very active

2 Id., 314 U.S. at page 456, 62 S.Ct. at page 303, 86 L.Ed. 329.

3 But these rules are not appropriate alone to those who come here to enter the Federal service. See Beedy v. District of Columbia, 1942, 75 U.S.App.D.C. 289, 126 F.2d 647, cert. not sought.

4 Fla.Comp.Gen.Laws, 1937, c. 18061, § 1, § 248(1), Perm.Supp.1940, F.S.A. § 98.02.

interest, throughout his Federal service, in the local affairs, both civic and social, of Starke, Florida. He subscribed to the Starke newspaper. He contributed to civic and charitable institutions there, making the largest single donation to the upkeep of Crosby Lake Cemetery, in which a family burial lot was located. He corresponded with citizens of Starke, discussed their problems, and assisted in solving them.

In 1937, 1938, and 1939, the decedent paid District of Columbia intangible personal property taxes, amounting to $98.54, $217.-54, and $182.26, respectively. Through the years he filed his Federal income tax returns with the Collector of Internal Revenue at Baltimore, Maryland, explaining this to be the custom of many Federal employees. An Assistant Vice-President of the American Security and Trust Company here testified that in 1939 he discussed with the decedent the question of the District income tax, and advised him that under his interpretation of the Act anyone receiving a salary here in the District was subject to the income tax. He testified further that on that occasion the decedent claimed his legal residence in Florida. The bank official then prepared and the decedent filed his return, paying a District income tax for 1939 amounting to $150.73.

The decedent's will, dated July 12, 1937, began with the statement: "I, Charles F. Pace, *of* the City of Washington, District of Columbia * * *." [Italics supplied] He died in the District on March 20, 1940. After his death, the will was deposited with the Register of Wills in the District. The record shows, however, that upon motion of the petitioner it was transmitted by the District Court to the Clerk of the County Court for Bradford County, at Starke, Florida, for probate. The will was probated in Florida. Thereafter the District Court here, sitting in Probate, granted ancillary letters testamentary to the petitioner as executrix.

Other minutiae might be stated, but we believe the foregoing sets out the evidence necessary to present the domiciliary issue. The controversy began in this wise: The petitioner paid the Assessor, under protest, an inheritance tax assessed upon the transfer to her of certain intangible property of District situs formerly owned jointly with the decedent. She then appealed the assessment to the Board of Tax Appeals, on the ground that the decedent had been domiciled in Florida at the time of his death.

The Board of Tax Appeals, after hearing argument, determined that the decedent was domiciled in Florida at the time of his death, and ordered a refund of the tax paid. The District of Columbia then appealed to this court, but afterwards presented a motion, which was granted,[5] to remand the action to the Board of Tax Appeals for reconsideration in the light of the intervening decision of the Supreme Court in District of Columbia v. Murphy.[6] It was stipulated by the parties that the evidence adduced at the original hearing be considered as the evidence upon rehearing. The Board, upon reconsideration, adopted as its findings of fact the findings made in respect of the original hearing, except as to the nature of the decedent's intention to return to Florida upon the completion of his Federal employment. In its original opinion, the Board had stated that "whatever intention he had of returning to his former home was floating, and dependent on an event [terminating his Federal employment] which might not, and, in fact, did not occur." It is apparent that in its original determination, the Board reluctantly held Florida to be the decedent's domicile, doing so only because it felt bound by the decisions of this court. The Board stated that: "If the decedent had been employed in private industry or profession and had not been a Federal employee, the Board would not hesitate to rule that he was domiciled in the District of Columbia at the time of his death. * * * The decedent, however, was a Federal employee and claimed a legal residence in Florida and voted regularly therein. Such being the case the Board, under the decisions of the United States Court of Appeals in Sweeney v. District of Columbia, 72 App.D.C. 30, 113 F.2d 25, 129 A.L.R. 1370; District of Columbia v. Murphy, 73 App.D.C. 347, 119 F.2d 451 and District of Columbia v. DeHart, 73 App.D.C. 345, 119 F.2d 449, concludes as a matter of law that at the time of his death the decedent was not domiciled in the District of Columbia."

In its second and final opinion, however, the Board concluded as follows regarding the evidence relevant to the intent to return: "The evidence adduced has not, in the mind of the Board, produced the

5 District of Columbia v. Pace, No. 8007, judgment entered February 12, 1942.

6 1941, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329.

belief that the decedent during his residence in the District of Columbia *always had a fixed and definite intent to return* and take up his home in Florida when he should have been separated from the Federal service, and for that reason the Board cannot find that the decedent has *overcome the presumption, arising from his maintaining a home in the District,* that he was domiciled therein." [Italics supplied]

Thereupon, the Board reversed its former ruling and held the decedent to have been domiciled in the District. Obviously, however, the nature and degree of the intent attributed to the decedent was the same on each hearing. The Board's right-about-face was predicated upon the Supreme Court opinion in District of Columbia v. Murphy,[7] implicitly relied upon by the Board as changing the rule regarding the determination of domicile. The appropriate words in the Murphy opinion are as follows: "The place where a man lives is properly taken to be his domicile until facts adduced establish the contrary. * * * The taxing authority is warranted in treating as prima facie taxable any person quartered in the District on tax day whose status it deems doubtful. It is not an unreasonable burden upon the individual, who knows best when he came, what he left behind, and his own attitudes, to require him to establish domicile elsewhere if he is to escape the tax."[8]

■ We held in Beedy v. District of Columbia,[9] however, that the Murphy case did no more than shift to the individual quartered in the District the burden of proof to establish domicile elsewhere—that the traditional substantive standards of the domiciliary concept remained unaltered. The District admitted this in oral argument before us. It is proper, therefore, that we determine, upon this review, whether the requisite burden has been sustained. A domiciliary determination involves a compound consideration of fact and law, and we are privileged to review the legal effect attached to the evidence before the Board.[10]

We have taken pains to square carefully the status of the decedent with the considerations mentioned by the Supreme Court as being relevant to a proper answer to the question of domicile, which considerations, as we understand them, are in no wise expressed by way of limitation. We believe that the petitioner has favorably shown, as regards the decedent, "whence he came", "what he left behind", and "his own attitudes" in the premises. The record indicates that the decedent's employment required his presence here. In the beginning his position was political in character. His high post was held at the will of the Senate. It has been demonstrated that he kept closely in touch with the election booths in Florida throughout the years. He persistently refused to acquire a "home" in the District. He did not bring his household goods with him to the District. All of his investments in realty, and the vast preponderance of his bank deposits, were situated in Florida. He belonged to no clubs, lodges, social or civic groups in the District of Columbia—and this cannot be attributed to misanthropic leanings, for the record demonstrates that the decedent was socially-minded and generous as regards his friends and neighbors in Florida. Florida had long been his family seat. He was not a "bird of passage". Throughout his long service here, he had never severed the "threads of close association" with his friends in Florida. His many declarations as to his intent to return to his domicile of origin and his attitude toward the District leave no doubt in this regard. These statements are persuasive to us because they were made throughout his Federal service, and at such times and under such circumstances that there was no occasion for them to be self-serving. Many of them were made before there was any tax problem involved or contemplated. The circumstances under which he paid income tax in the District of Columbia lend little weight to the side of District domicile. He had been advised by the bank official with whom he conferred that anyone receiving a salary here in the District was subject to the income tax; and upon that very occasion the decedent again maintained that his legal residence was in Florida.

■ The facts submitted to the District Court, sitting in Probate, led it to conclude that "Charles F. Pace, deceased, departed this life a resident of the Town of Starke,

7 Ibid.

8 314 U.S. at page 455, 62 S.Ct. at page 309, 86 L.Ed. 329.

9 75 U.S.App.D.C. 289, 126 F.2d 647, 1942, cert. not sought.

10 Sweeney v. District of Columbia, 1940, 72 App.D.C. 30, 32, 113 F.2d 25, 27, 129 A.L.R. 1370, certiorari denied 1940, 310 U.S. 631, 60 S.Ct. 1082, 84 L.Ed. 1402.

Bradford County, State of Florida * * *", and it ordered his will transmitted to the Clerk of the appropriate court in that State. A few weeks later the District Court in effect redetermined the question of domicile when it granted ancillary letters testamentary to the petitioner. Although not conclusive, these orders are entitled to weight.

We are of the opinion that the record discloses that the Board erroneously concluded on rehearing that the decedent had failed to overcome the presumption, arising from his "living" in the District, that he was domiciled therein. The petitioner amply sustained the requisite burden of proof that the decedent maintained his domicile in Florida. We expressly bottom our conclusion upon the opinion of the Supreme Court in District of Columbia v. Murphy.[11]

Reversed and remanded.

---

[11] 1941, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329.